Gary Lynn JONES and Jimmy David HEDGE *v.*
STATE of Arkansas

CR 94-70 889 S.W.2d 706

Supreme Court of Arkansas
Opinion delivered November 21, 1994
[Rehearing denied January 9, 1995.]

*Henry & Mooney*, by: *Wayne Mooney*, for appellant Jones.

*Tiner & Hunter*, for appellant Hedge.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. The appellants, Gary Lynn Jones and Jimmy David Hedge, raise two and eleven points, respectively, for reversal of their first-and second-degree murder convictions. Jones's two arguments overlap with those made by Hedge (under three headings) and neither is persuasive. The same is true for the arguments advanced by Hedge, and we therefore affirm the convictions of both appellants.

### Facts

On the evening of October 4, 1991, appellant Gary Lynn Jones, appellant Jimmy David Hedge, Tammy Hedge, Jerry Clampit, James Blackwell, Carolyn Blackwell, and Jimmy Jack Crawford were together at a cafe called the Greasy Spoon in Harrisburg, Arkansas. At some point between midnight and 1:00 a.m. on October 5, 1991, the Hedges and Clampit left in one vehicle and drove to a gas station. There, Jimmy Hedge had a ver-

bal altercation with James Allison (Dutch) Sims, Jr., accusing him of previously running his wife off the road. Sims drove a female companion to her car, and, on returning to the gas station, he invited Hedge to follow him. Subsequently, after Hedge and his party had followed him to his residence, Sims fired a gun over their vehicle from his driveway.

The Hedges and Clampit then returned to the Greasy Spoon. Mrs. Hedges ran in and told Jones, her brother, what had happened. Angered, Jones, accompanied by Hedge, Clampit, Blackwell, and Crawford, drove to the trailer house where Sims resided with his parents. Sims was standing in the front yard, holding a tire tool and Jones, after getting out of his vehicle, charged Sims and began fighting with him. The other men surrounded Sims and Jones, and, according to Crawford's testimony, Jones, Hedge, and Clampit all struck Sims with their fists. Blackwell testified that Jones pulled out a knife and stabbed Sims twice. Both Hedge and Clampit struck Sims, Blackwell stated, and Sims dropped to the ground.

Patsy Sims, the victim's mother, testified that she came outside and saw "five men in my yard and they were all around my son." She ran into the house, grabbed a pistol that was on a nightstand, went out on the porch, and fired in the air and at Jones's truck. According to Ms. Sims, when she fired her gun, Hedge threw his hands up and looked at her. He and the others fled the scene.

Meanwhile, Jones went to his truck and started it. At that point, James Allison Sims, Sr., the victim's father, entered on the passenger side to seize the ignition key, and the two men struggled. Mr. Sims held Jones down by his hair while Ms. Sims shut the engine off and took the key. Jones remained at the scene. Then Mr. Sims found his son on the ground, dead, with several stab wounds. The cause of death was later determined to be a stab wound to the left side of the chest that punctured the lung and heart.

Appellants Jones and Hedge, along with Clampit, Blackwell, and Crawford, were charged by information filed on November 26, 1991, with first-degree murder and second-degree battery in the death of James Sims, Jr. A jury trial was held in late September and early October 1993, with Jones and Hedge as co-defendants. Clampit, Blackwell, and Crawford were called as witnesses for the State. Jones was found guilty of first-degree

murder and sentenced to forty years imprisonment, and Hedge was found guilty of second-degree murder and sentenced to fifteen years imprisonment. From that judgment, this appeal arises.

*Issues*

Given the number of points on appeal, we find it useful to set forth the various issues as framed by Hedge and Jones, noting the arguments which overlap:

I. *(Hedge)* Whether the trial court erred in refusing to grant appellant Hedge's motion for mistrial based upon the jury panel being exhausted and the thirteen jurors being called in after all of Hedge's peremptory strikes were used; *(Jones)* whether the systematic exclusion of farmers and 13 jurors who had served the day before and forcing appellant Jones to select a jury from the remaining panel unfairly restricted Jones's right to trial by an a fair and impartial jury.

II. *(Hedge)* Whether the trial court erred in not granting a mistrial since the jury did not set punishment after being told by the trial court that he would fix punishment if they could not.

III. *(Hedge)* Whether the trial court erred in giving preliminary instructions to the jury over Hedge's objections.

IV. *(Hedge)* Whether the trial court erred in refusing to grant a mistrial when it instructed the jury that a piece of photographic evidence was impartial.

V. *(Hedge & Jones)* Whether the trial court erred in allowing the prior statement of a state's witness to be read into the record as a prior consistent statement.

VI. *(Hedge)* Whether the trial court erred in refusing to grant a mistrial after instructing the jury as to the effect of prior inconsistent statements.

VII. *(Hedge)* Whether the statement of a state's witness made to a police officer was hearsay and, as such, inadmissible.

VIII. *(Hedge & Jones)* Whether the trial court erred in refusing to grant Hedge's motion for a mistrial based upon

the exclusion of all farmers from the venire panel. (Combined with Point I.)

IX. *(Hedge)* Whether the trial court erred in providing the jury the wrong definition of reasonable doubt. (Combined with Point III.)

X. *(Hedge)* Whether the trial court erred in refusing to grant Hedge's motion for directed verdict.

XI. *(Hedge)* Whether there was sufficient evidence to corroborate the accomplice testimony.

### Motions for directed verdict

■ Appellant Hedge contends that the trial court erred in denying his motions for a directed verdict (Point X) and asserts that the evidence was insufficient to corroborate accomplice testimony (Point XI). As a motion for a directed verdict is a challenge to the sufficiency of the evidence, we must consider the issue of the sufficiency of the evidence before addressing other points on appeal. *Graham* v. *State*, 314 Ark. 152, 861 S.W.2d 299 (1993); *Hendrickson* v. *State*, 316 Ark. 182, 871 S.W.2d 362 (1994).

Hedge's attorney made a specific motion for directed verdict at the close of the State's case, arguing that there was no evidence presented at trial to show that Hedge was guilty of "first-degree murder or any type of homicide" or that he "aided, assisted, abetted, encouraged, solicited, or [did] anything else" to contribute to the homicide. While counsel for Jones specified uncorroborated accomplice testimony as a basis for his motion for a directed verdict, Hedge's attorney made no reference whatsoever to accomplice testimony in his request.

At the close of all the evidence, Jones's defense counsel merely said, "We rest, Your Honor. Show our motion renewed, please." Hedge's attorney then addressed the trial court with a single word: "Judge?" At that point, the trial court declared, "Show motion for directed verdict on behalf of Hedge and on behalf of Jones renewed and denied."

■■ To preserve the issue of the sufficiency of the evidence in a criminal case, the appellant must move for a directed verdict both at the close of the State's case and at the close of

all of the entire case. *Hayes* v. *State*, 312 Ark. 349, 849 S.W.2d 501 (1993). Moreover, this court adheres to a strict construction of Ark. R. Crim. P. 36.21(b), which deals with the failure to question the sufficiency of the evidence, and has held that a general reference rather than a statement of specific grounds will not satisfy the requirement of the rule. *See Daffron* v. *State*, 318 Ark. 182, 885 S.W.2d 3 (1994); *Walker* v. *State*, 318 Ark. 107, 883 S.W.2d 831 (1994); *Brown* v. *State*, 316 Ark. 724, 875 S.W.2d 828 (1994); *Middleton* v. *State*, 311 Ark. 307, 842 S.W.2d 434 (1992); *Pilcher* v. *State*, 303 Ark. 335, 796 S.W.2d 845 (1990). A general motion constitutes a waiver of the right to challenge the sufficiency of the evidence. *Daffron* v. *State, supra.*

▇ The failure of Hedge's defense counsel either to include accomplice testimony as a ground for a directed verdict or to renew the motion for directed verdict rendered the motion insufficient to preserve specific arguments for appellate review. A "bright line" has been drawn. Directed verdict motions must state specific grounds. *Daffron* v. *State, supra; Walker* v. *State*, 318 Ark. 109, 883 S.W.2d 843 (1994). The sufficiency issue having been waived, the merits of these issues need not be considered. *Daffron* v. *State, supra.*

### Fair and impartial jury

Both Jones and Hedge urge in their first points for reversal, with Hedge overlapping in his Point VIII, that the trial court erred in refusing to grant a mistrial on the basis that both appellants were unable to obtain a fair and impartial jury drawn from the actual jury panel summoned by the court. Specifically, Jones and Hedge argue that the trial court erred first in excusing twelve jurors and an alternate who, immediately before the appellants' case, had served on a criminal trial that resulted in an acquittal and then in recalling them after respective counsel had exercised all of their peremptory challenges. They contend, further, that the trial court erred in systematically excluding all farmers from jury duty because the trial dates coincided with harvest time. The result, Jones and Hedge assert, was the impeding of their ability to make a jury selection from a cross-section of the population.

▇▇ A mistrial, of course, is an extreme remedy that should be resorted to only when an error is so prejudicial that justice can-

not be served by a continuation of the trial. *Littlepage* v. *State*, 314 Ark. 361, 863 S.W.2d 276 (1993). The granting or denial of a motion for mistrial lies within the sound discretion of the trial judge, and the exercise of that discretion will not be disturbed on appeal absent an abuse of that discretion. *Magar* v. *State*, 308 Ark. 380, 826 S.W.2d 221 (1992).

 A defendant does not have the right to have a jury of his choice from the panel, but only a right to a competent, fair, and impartial jury. *Stout* v. *State*, 247 Ark. 948, 448 S.W.2d 636 (1970); *Wells* v. *State*, 247 Ark. 386, 446 S.W.2d 217 (1969). Here, the farmers were excused, as the trial court noted, on a "case-by-case consideration" of their requests to be allowed to return to their harvests to avoid economic hardship beyond the normal sacrifice and inconvenience experienced by citizens called to jury duty.

 As the State points out, and as appellant Hedge acknowledges in his reply brief, the recent case of *Jones* v. *State*, 317 Ark. 131, 876 S.W.2d 262 (1994), is controlling with respect to the issue of the excusal of the farmers. In that case, which arose from the same county and the same circuit court, we held that, while the wholesale excusal from the venire of persons who claim farming as their occupation is reversible error if it is automatic and based solely on that fact, when each farmer is considered on an individual basis and the trial court determines that each would suffer extreme hardship, no systematic exclusion has occurred. The same is true here.

 Regarding the automatic excusal of the twelve jurors and an alternate in one lot, we hold that, however laudable the trial court's intention may have been to spare the previous jury a second consecutive trial and however well-known or established the court's policy may have been, it amounted to a systematic exclusion to exempt as a body the thirteen jurors and, as such, was error. The persons who served on the previous jury constituted a significant class of eligible jurors, as discrete in identity as the group of farmers who had been individually questioned and excused.

 Even though the trial court's action was error, the defect was cured by the court's recalling the members of the pre-

vious day's jury when the original panel of venirepersons was exhausted. As we have emphatically held, when objecting to the jury panel and its selection, one must show prejudice as well as any error. *Ruiz* v. *State*, 299 Ark. 144, 772 S.W.2d 297 (1989); *Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1988). Here, prejudice has not been demonstrated.

■ Jones and Hedge further complain that they were prevented from making their jury selection from a true cross-section of venirepersons because, by the time the thirteen jurors from the previous day's trial had been summoned, they had used all of their peremptory challenges and were obliged to accept the first juror called. This, however, is merely an allegation of error and does not constitute the required demonstration of prejudice. *Ruiz* v. *State, supra.* It was the responsibility of defense counsel, who were aware that the pool of thirty venirepersons might be depleted and that other jurors consequently would be summoned, to manage and exercise their peremptory challenges prudently. The trial court did not abuse its discretion in denying the motion for mistrial.

### Setting of punishment

For his second point on appeal, Hedge insists that the trial court erred in denying his motion for a mistrial based on the trial court's statement to the jury foreman that if the jurors could not agree on punishment, it would be set by the trial court.

The issue arises from the following exchange between the court and the foreman, when the jury returned to the courtroom after a period of deliberation:

> THE FOREMAN: If we were not able to come to an agreement, if we were to find one or the other guilty or not guilty, if we were not able to come to an agreement on the punishment, where do we go from there?

> THE COURT: All right. If you are unanimously agreed upon guilty on either defendant but are unable to agree on punishment, let me know.

> THE FOREMAN: I'll let you know that we are.

> THE COURT: You are?

THE FOREMAN: Yes.

THE COURT: All right. If the jury is unanimously agreed upon guilt but are unable, and you advise me that you are unable to agree on punishment, then you return a verdict of guilty and the punishment will be fixed by the Court.

THE FOREMAN: Okay.

THE COURT: Now, if you want to retire, deliberate, and see if you can agree upon a punishment for a moment, fine. In fact, I'd ask that you do retire and deliberate. Be sure that you let me know that you cannot agree upon punishment. If that happens, then it will be fixed by the Court.

The jury retired and later returned with guilty verdicts of first-degree murder for Jones, whose punishment was set at forty years imprisonment, and second-degree murder for Hedge, whose punishment designation was left blank on the verdict form. The trial court inquired whether the jury was unable to agree upon Hedge's sentence and, upon being informed that that was the case, went on to pronounce a sentence of fifteen years in the Department of Correction.

In *Ward* v. *State*, 236 Ark. 878, 880, 370 S.W.2d 425, 426 (1963), we held that:

the jury should not be told initially they can let the court impose the punishment but should be told only *after* they report they have reached a verdict of guilty but are unable to agree on the punishment to be imposed.

(Emphasis in original.) We reiterated this holding in *Weems* v. *State*, 259 Ark. 532, 534, 534 S.W.2d 753, 754 (1976), declaring such an instruction delivered "*prior* to a finding of guilty by the jury" to be reversible error. (Emphasis in original.) *See* Ark. Code Ann. § 16-90-107(a) (1987).

The circumstances in the present case, however, more closely resemble those in *Burford* v. *State*, 242 Ark. 377, 413 S.W.2d 670 (1967), where the jurors returned to the courtroom to inquire whether, if the defendant was found guilty, they could allow the court to fix punishment. There we held that the jury had

already reached its guilty verdict when the inquiry was made and that the trial court did not err in responding to the question. Here, too, it is evident from the foreman's statement "I'll let you know that we are" is an affirmative answer to the trial court's statement that "If you are unanimously agreed upon guilty on either defendant but are unable to agree on punishment, let me know." "You are?" the trial court asked, in order to clarify the mixed-tense response of the foreman. "Yes," the foreman confirmed.

At that point, the trial court permitted the jury to retire again and reconsider the question of punishment. Thus, not only did the trial court comply with settled statutory and case law, but it took pains to urge the jury to deliberate further and attempt to reach a decision on punishment, despite the fact that it would have been within the bounds of its authority had it simply called for the verdicts on the spot and imposed sentence.

Determining when the jury cannot agree is a matter over which the trial court has considerable discretion. *McGirt v. State*, 289 Ark. 7, 708 S.W.2d 620 (1986). The trial court did not abuse its discretion under the circumstances in refusing to grant a mistrial.

### Preliminary instructions and "reasonable doubt"

Prior to opening statements, the trial court, over a general objection by Hedge alone, orally instructed the jurors on various matters, including first-degree murder and reasonable doubt. After the instructions had been given, Hedge again objected, singling out the court's definition of reasonable doubt. The trial court overruled these objections, and Hedge argues in his Point III that the trial court committed error by giving undue emphasis to instructions which were subsequently repeated at the end of all testimony. In order properly to analyze Hedge's argument in this regard, we consider it in two subsections pertaining to the timing of the giving of the preliminary instructions and the definition of "reasonable doubt" provided by the trial court, a matter set forth in Hedge's Point IX.

### a. Timing

In *Bennett v. State*, 302 Ark. 179, 789 S.W.2d 436 (1990), this court held that Ark. Code Ann. § 16-89-125 (1987) unambiguously requires that jury instructions be given only

"[w]hen the evidence is concluded." The timing of the giving of instructions, we noted, relying on reported psychological studies, "can make a difference in a verdict." 302 Ark. at 185, 789 S.W.2d at 439. Prejudice resulted from the mixing of the times of delivery of instructions in *Bennett*, where the trial judge initially instructed the jury on everything but character evidence and the range of punishment and then, four days later, instructed on those two subjects, giving the impression that he thought the accused was guilty.

In these circumstances, though, no prejudice is evident. While the trial court may have erred in instructing the jury prematurely, the error was, under the facts of the present case, harmless. The various general preliminary instructions included one on first-degree murder; at the end of all the evidence, lesser included offenses were added to the previously given instructions, thereby expanding the possibilities for the jury's decisionmaking. Indeed, the jury was fully and completely instructed before it retired to deliberate and was provided with written copies of the entire set of instructions. The jury returned a second-degree-murder verdict on Hedge rather than one for first-degree murder, with which he had been charged. Therefore, the preliminary instructions occasioned him no prejudice and, though error, were harmless.

### b. Definition

In Hedge's Point IX, combined here with his Point III because it arises from the giving of the preliminary instructions, he contends that the trial court erred in refusing to declare a mistrial on the basis that it provided an erroneous and misleading instruction on "reasonable doubt."

The trial court, in delivering its preliminary instructions, informed the jury that the State had the burden of proving each defendant guilty beyond a reasonable doubt. The court then added the following:

> While the State's burden of proof is a strict and heavy burden, it is not necessary that the defendant's guilt be proved beyond a reasonable doubt. It is only required that the State's proof exclude any reasonable doubt. A reasonable doubt is a real doubt based upon reason and common sense after

careful and impartial consideration of all the evidence in the case. A juror is convinced beyond a reasonable doubt if after an impartial consideration of all the evidence in the case he has an abiding conviction of the truth of the charge.

While this instruction was based on AMCI 110,[1] it employed certain terms that do not appear in the model instruction, such as "real doubt" and "common sense," and deleted a clause.[2]

Hedge argues that the adjective "real" placed before "doubt" confuses the definition of "reasonable doubt." But, historically, the concept of reasonable doubt has been regarded as difficult to define with precision. See Commonwealth v. Webster, 59 Mass. 295 (1850). As the United States Supreme Court recently observed in Victor v. Nebraska, 511 U.S. ___, 127 L. Ed. 2d 583 (1994): "The government must prove beyond a reasonable doubt every element of a charged offense. In re Winship, 397 U.S. 358 (1970). Although this standard is an ancient and honored aspect of our criminal justice system, it defies easy explication." Slip op., 1.

In the Victor case, the Court noted that, provided a trial court instructs a jury on the necessity that guilt be proven beyond a reasonable doubt, the United States Constitution does not require the use of a particular form of words. Instead, the instructions, taken as a whole, must correctly convey to the jury the concept of reasonable doubt.

Two attempts to define reasonable doubt were at issue in Victor v. Nebraska, supra. In one of the case's paired appeals, a California trial court had instructed the jury that reasonable doubt

is not a mere possible doubt; because everything relating

---

[1]Since Hedge's trial, the model instructions have been revised, but AMCI 2d 110 is identical to AMCI 110.

[2]The text of the model instruction, which is to be given in every case, reads as follows:

> Reasonable doubt is not a mere possible or imaginary doubt. It is a doubt that arises from your consideration of the evidence and one that would cause a careful person to pause and hesitate in the graver transactions of life. A juror is satisfied beyond a reasonable doubt if after an impartial consideration of all the evidence he has an abiding conviction of the truth of the charge.

AMCI 2d 110. This definition, excepting some modifications, is taken from Laird v. State, 251 Ark. 1074, 476 S.W.2d 811 (1972).

> to human affairs, and *depending on moral evidence*, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, *to a moral certainty*, of the truth of the charge.

*Id.*, Slip op. at 4. (Emphasis in original.) The California Supreme Court rejected the claim that the highlighted terms violated the Due Process Clause, and the United States Supreme Court affirmed its decision. Noting that the language of the instruction had been taken verbatim from Massachusetts Chief Justice Lemuel Shaw's language in *Commonwealth* v. *Webster, supra,* 59 Mass. at 320, the Supreme Court stated that it had previously equated "moral certainty" with the phrase "beyond a reasonable doubt" and concluded that the term "moral evidence," though not commonly used, retains unchanged its 19th-century meaning of "empirical evidence," *i.e.,* the proof introduced at trial. Slip op. at 6, 9.

Without condoning the use of the term "moral certainty," the Court concluded that, in the context of the surrounding language of the instruction, there was "no reasonable likelihood that the jury would have understood moral certainty to be disassociated from the evidence in the case." *Victor* v. *Nebraska*, Slip op. at 13. As for the use of the phrase "not a mere possible doubt," the Court pointed again to the context, quoting the final portion of the sentence in question ("everything . . . is open to some possible or imaginary doubt"), to show that the sense in which the instruction used the word "possible" was clear. Slip op. at 14.

Turning to the companion case from Nebraska, the Court affirmed the state court's decision to uphold the following jury-instruction language:

> "Reasonable doubt" is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, *to a moral certainty*, of the guilt of the accused. At the same time, absolute or math-

ematical certainty is not required. . . . You may find an accused guilty upon the *strong probabilities of the case*, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an *actual and substantial doubt* arising from the evidence, from the facts and circumstances shown by the evidence, or from the lack of evidence on the part of the state, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

Slip op. at 15. (Emphasis in original.) Although agreeing that the use of "substantial doubt" was "somewhat problematic," the Court held that the explicit distinction between that phrase and "doubt arising from mere possibility, from bare imagination, or from fanciful conjecture" removed any ambiguity of meaning. Slip op. at 16-17. Moreover, the Court noted, the instruction provided an approved alternative definition of "reasonable doubt" — that which would cause a reasonable person to hesitate to act.

Regarding the use of "moral certainty," the Court remarked that the instruction equated a doubt sufficient to preclude moral certainty with the acceptable "doubt as would cause a reasonable and prudent person . . . to pause and hesitate" to act. Slip op. at 18. Finally, the Court sanctioned the use of "strong probabilities" where the sentence in which the phrase was used continued with a proviso that the probabilities would be strong enough to exclude any reasonable doubt.

The context in which a term or phrase is used in an instruction is, therefore, of critical importance. In the present case, the term "real doubt" is quite clearly a paraphrase, cast in positive terms, of the phrase "not a mere possible or imaginary doubt," which appears in AMCI 2d 110 and which derives ultimately from *Commonwealth* v. *Webster, supra*. Indeed, the word "real" is defined in part as "actual rather than imaginary, ideal, or fictitious." *The Random House Dictionary of the English Language*, 2nd ed. (1987), p. 1607.

Otherwise, the language of the preliminary instruction followed the model instruction, apart from the inclusion of the phrase "based upon reason and common sense" and the deletion of the clause "and one that would cause a careful person to pause and hesitate in the graver transactions of life." With respect to the

invocation of "reason and common sense," the instruction simply imported a variant of the "observations and experiences" language of AMCI 2d 103 and, in effect, embraced the spirit of the deleted "careful person" passage.

 Although, in the context of the entire preliminary instruction, the sense of AMCI 2d 110 was preserved, we must emphasize that we do not condone the trial court's adaptation of AMCI 2d 110. However, taken as a whole, the instruction correctly conveyed to the jury the concept of reasonable doubt.

Further, the trial court delivered, without variance, the complete model instruction at the end of all the evidence and provided a written copy to the jury before it retired to deliberate. Under the circumstances, Hedge has failed to show in what way he was prejudiced by the superseded preliminary instruction. The trial court did not err in declining to grant the extreme remedy of a mistrial.

### Comment on "impartial" evidence

Hedge contends, in his Point IV, that the trial court erred in refusing to grant a mistrial because the judge commented on the evidence when he referred to a diagram of the crime scene as "impartial." As the diagram, which displayed the location of the body, various vehicles, and other points of reference in relation to the trailer house, was being marked for identification, the trial court advised the jurors:

> This is suppose[d] to be just an impartial diagram of the scene where everything was at the time to aid and assist you in understanding the evidence and testimony.

Hedge's attorney moved for a mistrial, asserting that the court had commented on the evidence, and the court denied the motion.

At that point, Hedge's counsel requested an admonition, and the court addressed the jury as follows:

> All right, ladies and gentlemen, you were told, the Court a moment ago called this an impartial diagram. It's up to you. It's up to you to determine whether or not it is impartial or not.

On appeal, Hedge claims that the admonition compounded the error.

■ Considering the context of the trial court's original remarks and admonition, we cannot say that the court abused its discretion in denying the motion for a mistrial. The diagram in question simply identified locations at the crime scene and imported no implication of guilt on Hedge's part; the illustration thus bore neutral evidentiary value, and the trial court merely pointed out the obvious.

Moreover, any error inherent in the trial court's statement to the jurors was cured by the admonition, given promptly upon Hedge's request, which in effect instructed the jury to disregard the previous remark and reach its own conclusion. *See Crossley* v. *State*, 304 Ark. 378, 802 S.W.2d 459 (1991). Hence, Hedge cannot now assert prejudice. *Magar* v. *State, supra.*

### Reading of prior statement of witness

Both Jones, in his Point II, and Hedge, in his Point V, argue that the trial court erred in allowing the prior statement of a witness to be read into the record as a prior consistent statement. They contend that the statement constituted inadmissible hearsay.

The State called James Blackwell, one of the men present at the time of the murder who was charged with the crime but not tried with Jones and Hedge. He was questioned, on direct examination, about what he did and what he observed on the night in question. On cross-examination, counsel for both Hedge and Jones pressed Blackwell about a statement he had given to the police soon after the crime occurred in which he described his actions when he witnessed Jones and Sims fighting. "I saw Gary going for his knife," the statement read. "I tried to get to Gary but I saw him stab Dutch twice." Under cross-examination, Blackwell explained that he meant that he "hollered" at Jones when he said that he had "tried to get to [him]." As he put it, "I'm just a country boy."

During re-direct examination, the State showed Blackwell his statement and asked him to read the first paragraph. The following colloquy then occurred at the bench:

MR. TINER (HEDGE'S ATTORNEY): We object to the witness reading any statement. He's here and he can testify live as to what his recollection is and he can use this to refresh his recollection. But we are objecting to his read-

ing the statement which the Court has already denied him the opportunity to admit.

THE COURT: Court simply said that would not be admitted into evidence as substitutive evidence. Certainly he may refer to it and examine it, may read from that statement. In other words, you inferred or implied that he had changed some of his testimony, a recent fabrication. If he made a statement, then that may be offered to rebut any allegation, insinuation of recent fabrication. For that purpose your objection will be overruled.

MR. TINER: The point is, Your Honor, that we have inferred that he has changed his mind on it. That's what we're objecting to.

THE COURT: If he made a prior statement consistent with his sworn testimony here, then it may be appropriate to show it.

MR. MOONEY: Actually he did.

THE COURT: He may either be asked to read the statement himself for refreshing his memory—

MR. MOONEY: It was consistent.

THE COURT: —read it out loud, he may read the prior inconsistent statements.

MR. TINER: Your Honor, it's our position that his testimony was consistent with his statement.

THE COURT: Was consistent?

MR. TINER: Yes, sir.

MR. DAVIS (PROSECUTOR): And I was at a different cross-examination, Your Honor, because they challenged him on what was in his statement for twenty minutes.

MR. TINER: We didn't challenge him, we just asked him about it.

THE COURT: All right. Court will overrule the objection. You may proceed.

The witness was then allowed to read the statement in its entirety.

A prior statement by a witness testifying at a trial is not hearsay if it is "consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." Ark. R. Evid. 801(d)(1)(ii). The word "recent," describing the fabrication, is merely a relative term, meaning that the challenged testimony was supposedly fabricated to meet the exigencies of the case. *Brown* v. *State*, 262 Ark. 298, 556 S.W.2d 418 (1977). But the principle has no application when a witness had the same motive for fabrication when the statement was made as he had when he testified in the case. *Id. See also Cole* v. *State*, 307 Ark. 41, 818 S.W.2d 573 (1991); *Pennington* v. *State*, 24 Ark. App. 70, 749 S.W.2d 680 (1988).

According to Jones and Hedge, Blackwell had the same motive for fabrication when he gave his statement to the police as he had when he testified at trial. He was arrested and charged with the same crime. The prior statement was given to the police in connection with the investigation. Blackwell's motive was unchanged throughout, they insist — he sought to absolve himself of any appearance of guilt in the homicide.

While there appears to be some superficial merit to this line of reasoning, it is evident, from a perusal of the exchange between the attorneys and the trial court at the time the objection to the reading of the statement was made, that defense counsel shifted their grounds for objection even as they lodged it, arguing first that "he has changed his mind" and then asserting that the "testimony was consistent with his statement." The sudden substitution of the basis for the objection prompted the prosecutor to remark in exasperation that "I was at a different cross-examination." By the end of the colloquy, Hedge's attorney was explaining that defense counsel had not challenged the witness on the statement but had just "asked him about it." It is a distinction too subtle to withstand scrutiny.

The record does not reflect that Jones actually objected on this point. He has thus failed to preserve the issue for appeal. Hedge, whose argument we may consider, claims that defense counsel used the statement Blackwell gave the police to impeach the witness but made no charge of recent fabrication in relation

to the statement. This claim is simply untenable in the light of the course pursued during cross-examination, where defense counsel suggested to Blackwell that "you remembered it [the events recorded in the statement] a whole lot better than you do here almost two years later," and the initial defense statement in the sidebar dialogue that "we have *inferred* that he has changed his mind on it." (Emphasis added.) As Rule 801(d)(1)(ii) indicates, a charge of recent fabrication may be either express or implied. The implication here was, to say the least, quite strong.

 Given the confused posture of Hedge's objection (which seemed to entail an improvisational abandonment of the original grounds) and the failure of Jones to lodge a formal objection at all, added to the fact that the jury had already heard parts of the statement during the cross-examination, we cannot say that the trial court erred in allowing the entire statement of witness Blackwell to be read.

### Limiting instruction

In his Point VI, Hedge advances his contention that the trial court erred in denying his motion for mistrial made on the basis of a limiting instruction given by the trial court concerning prior inconsistent statements made by a witness. He claims that the action of the trial court was improper and constituted a comment on the evidence.

Jimmy Jack Crawford, on cross-examination, was questioned about a prior statement he had made to Officer David Layman in an effort by counsel for Hedge to impeach the witness. When asked if everything he had told the police officer was the truth, Crawford replied, "Well, I just — I don't remember actually. That was a long time ago and I was shaken up. So I could've said anything. But what I'm telling here today is the truth."

Following an objection by the State to the "argumentative" character of the questioning, the trial court admonished the jury as follows:

> Evidence that a witness previously made a statement which is inconsistent with his testimony at the trial may be considered by you for the limited purpose of judging or testing the credibility of the witness. But you may not con-

sider that prior inconsistent statement as evidence going to the truth of the matter asserted in that prior statement.

Defense counsel objected that the instruction was a comment on the evidence, a position maintained on appeal.

██ The instruction in question followed AMCI 2d 202 and, in so doing, was a correct instruction on the law. There is no constitutional prohibition against a trial court commenting on the law as opposed to the facts. *Moore* v. *State*, 304 Ark. 257, 801 S.W.2d 638 (1990). Further, the commentary on the model instruction indicates that the best practice is for the trial court to deliver AMCI 2d 202 immediately after the prior inconsistent statement is brought forth, as the trial court did here.

The trial court did not err in refusing to grant the extreme remedy of a mistrial.

### Hearsay objection

Hedge argues, in his Point VII (the final one to be reviewed), that the trial court erred in overruling his hearsay objection made during the State's re-direct examination of Jerry Clampit. It is clear, however, that the State was impeaching the witness with a prior inconsistent statement.

The State asked Clampit why he and the other men went with Jones to Sims's house. The witness replied that it was "[j]ust to see what was going to happen." The State then posed the following query: "I don't suppose you made the statement to David Layman at the jail during your statement that we were going out there to rough up Dutch Sims?"

Hedge objected on the basis of hearsay and his right to confront witnesses. His objection was overruled. Clampit then acknowledged having made the statement to the police officer, explaining that "I didn't think all of us was going to rough him up, but I figured someone would whup the hell out of him."

██ When evidence is offered to show that a witness made a prior inconsistent statement, rather than for the truth of the matter asserted, the evidence cannot be excluded as hearsay. Ark. R. Evid. 801(d)(1)(i); *Allen* v. *State*, 277 Ark. 380, 641 S.W.2d 710 (1982). This is a clear-cut example of the evidentiary rule

in operation. The trial court did not err in overruling Hedge's hearsay objection.

Affirmed as to appellant Hedge; affirmed as to appellant Jones.