Allen Wayne HUDSON *v.* STATE of Arkansas

CA CR 02-1283 146 S.W.3d 380

Court of Appeals of Arkansas
Division III
Opinion delivered February 11, 2004

[Rehearing denied March 3, 2004.]

*Montgomery, Adams & Wyatt, PLLC*, by: *Dale E. Adams*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

Andree Layton Roaf, Judge. Appellant Allen Wayne Hudson was convicted of first-degree murder and aggravated robbery, for which he was sentenced as an habitual offender to respective terms of imprisonment of forty-two years and twenty years, to be served consecutively. On appeal, Hudson argues that the trial court erred in: (1) erroneously admitting into evidence a prior consistent statement of a witness pursuant to Ark. R. Evid. 801(d)(1)(ii); (2) admitting evidence of other crimes and bad acts pursuant to Ark. R. Evid. 404(b); (3) sentencing him for both first-degree murder and aggravated robbery when both offenses were

committed by the same act and one was an element of the other, which was double jeopardy under the state and federal Constitutions; (4) failing to perform its gate-keeping function in allowing expert testimony on blood-spatter pattern analysis because such evidence is not reliable or relevant scientific evidence pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). We affirm on all points.

Hudson was charged as an accomplice to capital murder and aggravated robbery in connection with the death of Grace Vowell, a ninety-three-year-old resident of Green Forest, Arkansas. Vowell was bludgeoned to death while in her bed with what was later determined to be a claw hammer. Three other defendants, Ronald Garner, Damon Fuson, and Sony Weathereal, were also charged as accomplices to the aggravated robbery and murder. Hudson does not challenge the sufficiency of the evidence to support the convictions; thus, a detailed recitation of the facts is unnecessary.

Hudson, the three other defendants, and Donna Clark went to the victim's home on the night of December 10, 1999, with the purpose of getting money to buy drugs. While Clark remained in their vehicle to act as a lookout, Hudson and the other three entered the house where the robbery and murder were committed. Weathereal and Clark testified about Hudson's involvement in the crimes, and Weathereal further testified that he saw Hudson wash his hands and burn his shirt under a bridge afterwards. Several of the State's witnesses, including Rachel Popeet and Delsey Webber, testified about statements Hudson made to them after the murder in which he acknowledged his involvement.

After all of the evidence was presented, the trial court instructed the jury that Clark and Weathereal were accomplices to the robbery and murder by their own testimony and that their testimony must be corroborated by other evidence. After deliberation, the jury convicted Hudson of the lesser-included offense of first-degree murder, as well as aggravated robbery. Hudson was sentenced to twenty years' imprisonment for the aggravated robbery conviction and forty-two years' imprisonment for the first-degree murder conviction. The trial court ordered that the sentences be served consecutively.

Hudson first argues that, because the defense's cross-examination of Delsey Webber did not imply that she had changed her initial statement to the police, the trial court erroneously admitted into evidence her two prior statements pursuant to Ark. R. Evid. 801(d)(1)(ii). This issue arose during the defense's cross-

examination of Webber, when she was questioned extensively about a prior videotaped conversation with Officer Brad Handley of the Green Forest Police Department on March 26, 2001, the same day that she was interviewed by the prosecutor and received a subpoena to testify in the case. The conversation came about because Webber, who was nervous about testifying, called Handley after receiving the subpoena and asked that he meet her.

After Webber confirmed during direct examination that no one had told her what to say in her testimony, defense counsel showed her the transcript of the March 26 conversation and questioned her as to whether Handley had advised her to testify that Hudson had "wanted to buy some dope," in response to anticipated questioning. Webber was also confronted with the March 26 statement to impeach her testimony that she had not tried to commit suicide or had not told anyone that she was the star witness in the case in order to be the center of attention. She was also questioned about a portion of her recorded conversation with Handley where she stated that the prosecutor had told her to look at him before answering any questions at trial and that he would signal her whether to answer or not. In addition, Webber was questioned as to where she was currently living and as to who was paying the bill. Webber replied that she was staying in a motel and that Carroll County was paying for it, although probably just through that night.

On re-direct, the prosecutor sought to introduce Webber's March 7 written statement to police, in which she first discussed her conversation with Hudson and what he had told her regarding Vowell's murder. Defense counsel objected, and the prosecutor replied that it was for the purpose of rebutting an express accusation that her testimony at trial was recently fabricated. The trial court overruled the objection, agreeing that the defense had made express or implied charges of recent fabrication or improper influence or motive in connection with Webber's trial testimony, especially considering the inquiry into Webber's current living conditions. The March 7 statement was then admitted by the trial court, with a limiting instruction to the jury that the statement was not to be considered for the truth of the matter asserted, but only to show that it was consistent with Webber's testimony at the trial.

After further re-direct examination on the March 26 conversation between Webber and Handley, where she attempted to explain what she had meant when she had stated that the prosecutor had told her to look at him before answering any questions at

trial, the prosecutor sought to introduce the tape recording of this conversation. The prosecutor argued that the improper motive the defense had tried to establish was from this conversation and that the jury needed to hear the entire tape to understand the context in which she made that statement. Although he initially suggested that the entire tape be played, defense counsel objected when the prosecutor sought to introduce it. The trial court allowed its introduction, stating that the defense had placed into issue what Webber had told Handley in relation to her anticipated testimony.

■■ Hudson now argues on appeal that the trial court erred in allowing both the March 7 and 26 prior statements of Webber into evidence under Ark. R. Evid. 801(d)(1)(ii). The general rule is that a prior consistent statement of a witness is not admissible to corroborate or sustain his testimony given in court, as to allow such statements would be self-serving and cumulative. *Harris v. State*, 339 Ark. 35, 2 S.W.3d 768 (1999). However, according to Ark. R. Evid. 801(d)(1)(ii), a prior statement by a witness is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is "consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." *See also Frazier v. State*, 323 Ark. 350, 915 S.W.2d 691 (1996). "The word 'recent,' describing the fabrication, is merely a relative term, meaning that the challenged testimony was supposedly fabricated to meet the exigencies of the case." *Jones v. State*, 318 Ark. 704, 724, 889 S.W.2d 706, 716 (1994). Thus, this principle has no application when a witness had the same motive for fabrication when the statement was made as he had when he testified in the case. *Id.*

Hudson argues that he did not assert in his cross-examination that Webber had changed her testimony from her earlier statements to police, but was merely impeaching her credibility in general. Hudson asserts that he only referred briefly to the prior statements in question and that the trial court's admission of these statements were only used to bolster Webber's testimony at trial, which is not permitted under Rule 801(d)(1)(ii). As the State argues, contrary to Hudson's assertions, an examination of the record demonstrates that the cross-examination of Webber was primarily centered on the March 26 statement. Not only did the defense impeach Webber's testimony at trial in several instances by referring to the transcript of this March 26 conversa-

tion, but also expressly and impliedly suggested several different motives and influences on Webber's trial testimony, such as that Officer Handley told her what to say at trial during the March 26 conversation, that she was the "star witness" and would make things up and lie to be the center of attention, and that she was being provided room and board in exchange for her testimony.

These attempts to portray that Webber had recently fabricated her testimony and that there were improper influences and motives on her trial testimony allowed the prosecution to properly admit her prior consistent statements under Rule 801(d)(1)(ii). These suggestions of improper influence and fabrication occurred subsequent to Webber's March 7 statement to police, which was given before she learned that she would be subpoenaed to testify in Hudson's case. Thus, this statement was properly admitted into evidence.

The tape recording of the March 26 statement was also properly admitted pursuant to this rule. In *Frazier v. State, supra*, the trial court allowed a prior consistent statement by a witness to be admitted into evidence after the witness was extensively cross-examined and impeached on his prior statements to point out inconsistencies in his trial testimony. The supreme court held that the prior statement was properly admitted under Rule 801(d)(1)(ii). *Id.* The court stated that defense counsel had made every attempt to show that the witness's trial testimony was inconsistent with his earlier statements and that "fairness dictated that the prosecutor be allowed to explore this area of inquiry to clarify any confusion or misapprehension that may have lingered in the jury's mind from defense counsel's examination." *Id.* at 354, 915 S.W.2d at 693; *see also Harris v. State, supra* (holding that trial court properly admitted witness's entire prior statement where defense counsel had sought to discredit her trial testimony on cross-examination by referring to the prior statement because the jury was thus afforded the opportunity to view the statement and to determine whether the implied charge of recent fabrication was valid); *Cooper v. State*, 317 Ark. 485, 879 S.W.2d 405 (1994) (allowing witness to testify on re-direct about prior consistent statement by victim where defense counsel during cross-examination had cast doubt on the veracity of the victim's allegations against defendant and where the victim was subject to cross-examination concerning the statement).

Although Hudson argues that he was only referring to Webber's prior statements to impeach her trial testimony and that

he had not made an allegation of recent fabrication in relation to these prior statements, this same argument was rejected in *Jones v. State, supra*, where, as in this case, defense counsel had thoroughly cross-examined and impeached the witness on the prior statements. The court in *Jones* stated that the defense's argument that it had not made a charge of recent fabrication but had merely "asked" the witness about the prior statements was "simply untenable in light of the course pursued during cross-examination" and that the distinction was "too subtle to withstand scrutiny." *Id.* at 724-25, 889 S.W.2d at 716. In affirming the trial court's decision to allow the entire prior statement to be read into evidence, the court also noted that the jury had already heard parts of the statement during cross-examination. *Id.* at 725, 889 S.W.2d at 716.

 Here, as in *Jones, supra*, and *Harris, supra*, the admission of the March 26 tape-recorded statement was proper given the defense's extensive cross-examination and impeachment of Webber concerning this statement, along with the charges of recent fabrication and improper influence and motive attributed to Webber's trial testimony, at least in part due to this prior statement. As the prosecution argued at trial, the jury was entitled to hear the entire statement to determine the context in which this charge of recent fabrication arose. *Harris, supra*. Thus, because the March 7 and 26 prior statements were properly admitted pursuant to Ark. R. Evid. 801(d)(1)(ii), the trial court did not abuse its discretion in allowing this evidence.

Hudson next argues that the trial court's admission of evidence of other crimes and bad acts pursuant to Ark. R. Evid. 404(b) warranted a mistrial and constituted reversible error. Prior to trial, Hudson filed a motion for the State to produce any Ark. R. Evid. 404(b) evidence that it intended to introduce at trial. At a pre-trial hearing, the State notified Hudson that it intended to introduce evidence showing that he engaged in drug use, which the State argued was relevant to show that his intent in entering Vowell's home was to obtain money to support his "hedonistic lifestyle." Hudson objected to the introduction of this evidence on the grounds that it was not relevant to this case and because it was more prejudicial than probative. The trial court denied Hudson's objection, stating that it would allow evidence of his drug use during the time period surrounding the crimes in question, as it was relevant to show Hudson's intent or motive in committing the aggravated robbery and murder. Hudson then moved for a mis-

trial, arguing that the jury had already been selected and that he would have voir dired the jury panel differently had he been aware of this evidence. The trial court denied the motion, noting that Hudson had ample opportunity to investigate the facts of the case and to acquaint himself with the State's file and that he should have anticipated the introduction of evidence relating to his drug use.

In addition to the evidence of Hudson's drug use introduced through the testimony of his accomplices, Sony Weathereal and Donna Clark, the State presented the testimony of Hudson's wife, Erin Hudson, who testified that both of them were addicted to methamphetamine during the time period in question. Kimberly Hayes, who hosted a party that Weathereal, Hudson, Garner, Fuson, and Clark attended the night of the murder, testified that she had spoken to Hudson about his methamphetamine use and had warned him about using dirty needles. Renee Yarberry, another friend of Hudson and the other co-defendants, testified that there was a lifestyle in Green Forest and Berryville that included the use of methamphetamine. Lisa McAllister also testified that she knew Hudson and the other co-defendants and that she had used methamphetamine with Hudson. Finally, Delsey Webber testified about her methamphetamine addiction and that, on the night that Hudson told her about his involvement in Vowell's murder, he had cut a hole in McAllister's sock to steal methamphetamine she had hidden there.

Hudson continually objected to the introduction of the evidence concerning his drug use and again moved for a mistrial during McAllister's testimony, arguing that the State's continued use of this evidence violated his First Amendment rights and that it was a denial of due process. At the close of the State's case and at the close of all of the evidence, Hudson renewed his motion for a mistrial. The trial court denied Hudson's motion each time. Hudson again argues on appeal that the trial court erred in allowing this evidence under Ark. R. Evid. 404(b), and contends that he was denied "fundamental fairness" by its admission, as he was tried "not only for what he did or did not do, but also for how he lived his life, *i.e.*, his lifestyle."

According to Ark. R. Evid. 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith; however, this evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. For evidence of

other crimes to be admissible under Rule 404(b), such evidence must be independently relevant, and the probative value of the evidence must outweigh any danger of unfair prejudice. *Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000). The admission or rejection of evidence of other crimes is left to the sound discretion of the trial court and will not be reversed on appeal absent a manifest abuse of discretion. *Id.*

■ The State argues that the evidence of Hudson's drug use was relevant to demonstrate his intent or motive in committing the aggravated robbery and murder. According to Weathereal's testimony, he and the other co-defendants intended to break into Vowell's home in order to get money to buy drugs. Much of the other testimony relating to Hudson's drug use merely corroborated Weathereal's testimony that Hudson and his friends used drugs frequently during the time period surrounding the murder and that this habit was costly. As other cases have held, where the purpose of evidence is to disclose a motive for a murder, anything and everything that might have influenced the commission of the act may be shown. *Gaines, supra*; *Lee v. State*, 327 Ark. 692, 942 S.W.2d 231 (1997). Thus, the State is entitled to introduce evidence of circumstances that explain the act, show a motive, or illustrate the accused's state of mind. *Lee, supra*.

In *Lee, supra*, the supreme court held that evidence that the defendant was on his way to obtain drugs shortly after the murder was relevant to explain his motive in killing the victim, as the State's theory at trial was that the victim was murdered for pecuniary gain. In *Donovan v. State*, 71 Ark. App. 226, 32 S.W.3d 1 (2000), this court held that evidence of the defendant's use of crack cocaine was properly admitted under Rule 404(b) in a prosecution for theft by deception, where it was independently relevant of the defendant's motive in using the victim's checks and where it was evidence that the defendant's use of the checks was unauthorized. In addition, in *Gaines, supra*, where the defendant was charged with capital murder and battery in connection with an arson, evidence that the defendant had smoked marijuana and sold crack cocaine on the night of the fire was admissible under the *res gestae* exception to Rule 404(b), where the evidence of the drug use and drug dealing were intermingled with and contemporaneous with the arson.

■ In this case, evidence of Hudson's drug use was probative of his motive in committing the offenses at issue, given

Weathereal's testimony that he and the other co-defendants' purpose in breaking into Vowell's home was to get money to finance their drug habits. As the trial court noted, although this evidence was prejudicial, it was relevant to motive and intent, and given the proximity of this evidence of drug use to the crimes at issue, it was not more prejudicial than probative.

Because this evidence was properly admissible under Rule 404(b), the trial court also did not err in denying Hudson's motions for a mistrial. A mistrial is an extreme remedy that should only be granted when the error is beyond repair and cannot be corrected by curative relief. *Donovan v. State, supra.* An admonition to the jury usually cures a prejudicial statement, unless it is so patently inflammatory that justice cannot be served by continuing the trial. *Id.* The trial court has wide discretion in granting or denying a motion for a mistrial, and this court will not disturb the trial court's decision in the absence of an abuse of discretion or manifest prejudice to the movant. *Id.*

The trial court in this case gave an admonition to the jury when evidence as to Hudson's drug use was first introduced by the State. Thereafter, when Hudson again moved for a mistrial during Lisa McAllister's testimony, he declined the court's offer of another cautionary instruction to the jury. There was no abuse of discretion in the trial court's denial of Hudson's motions for a mistrial given that the challenged evidence was properly admissible to show motive under Rule 404(b). *See Bowen v. State*, 342 Ark. 581, 30 S.W.3d 86 (2000) (holding that the trial court did not err in denying defendant's motion for a mistrial where evidence as to his drug dealing was relevant to show his motive in murdering the victim). Furthermore, the cautionary instruction given to the jury helped to cure any prejudice resulting from the admission of this evidence, *Bowen, supra* and *Donovan, supra*, and the fact that Hudson declined the trial court's offer of additional cautionary instructions cannot now inure to his benefit.

In his third point on appeal, Hudson contends that the trial court erred in sentencing him for both first-degree murder and aggravated robbery. Prior to sentencing, Hudson filed a motion arguing that the imposition of sentences for both offenses was violative of the double jeopardy provisions of the state and federal constitutions, as both offenses were committed by the same act and

one offense is included in the other. As the State asserts, Hudson's argument misapprehends and misapplies the principle of double jeopardy in this case.

The Double Jeopardy Clauses of the federal and state constitutions protect criminal defendants from: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *Hughes v. State*, 347 Ark. 696, 66 S.W.3d 645 (2002). Hudson was sentenced under Ark. Code Ann. § 5-1-110(d)(1) (Repl. 1997), which provides that, "[n]otwithstanding any provision of law to the contrary, separate convictions and sentences are authorized for . . . [m]urder in the first degree, § 5-10-102, and any felonies utilized as underlying felonies for the murder[.]"

As is explained in *Flowers v. Norris*, 347 Ark. 760, 68 S.W.3d 289 (2002), the legislature amended section 5-1-110 in 1995 to allow for separate convictions and sentences for certain specified offenses. The court in *Flowers* held that the State could not impose punishment for the underlying felony used to support an attempted capital-murder charge, because the legislature had not specifically declared its intent that the crime of attempt be included within its legislation. *Id.* The court also cited the legislature's intent, stated in Act 657 of 1995, as support for its holding:

> It is the intent of the legislature, pursuant to *Missouri v. Hunter*, 459 U.S. 359 (1983), to explicitly authorize separate convictions, sentences, and cumulative punishments for the offenses specified in Section 2 of the act. Cases such as *McClendon v. State*, 295 Ark. 303, 748 S.W.2d 641 (1988), which prohibit separate convictions, sentences, and cumulative punishments for such offenses are hereby overruled.

*Id.* at 766, 68 S.W.3d at 292-93.

In *Missouri v. Hunter*, 459 U.S. 359 (1983), the Supreme Court reversed the Missouri Court of Appeals and held that the defendant's double jeopardy rights had not been violated by his convictions and sentencing for both armed criminal action and first-degree robbery. The Missouri court had held that armed criminal action and first-degree robbery constituted the same offense under *Blockburger v. United States*, 284 U.S. 299 (1932). *Id.* In reversing the Missouri court's holding, the Court stated, "With

respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Id.* at 366. The Court also addressed its prior holdings in *Albernaz v. United States*, 450 U.S. 333 (1981), and *Whalen v. United States*, 445 U.S. 684 (1980), and stated the following:

> Our analysis and reasoning in *Whalen* and *Albernaz* lead inescapably to the conclusion that simply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes. The rule of statutory construction noted in *Whalen* is not a constitutional rule requiring courts to negate clearly expressed legislative intent. Thus far, we have utilized that rule only to limit a federal court's power to impose convictions and punishments when the will of Congress is not clear. Here, the Missouri Legislature has made its intent crystal clear. Legislatures, not courts, prescribe the scope of punishments.

> Where, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

*Missouri v. Hunter*, 459 U.S. at 368–69.

In *Rowbottom v. State*, 341 Ark. 33, 13 S.W.3d 904 (2000), a case cited by Hudson, the court quoted with approval the language set out above from *Hunter, supra,* and, relying on the Court's holding in *Hunter*, held that the defendant's convictions and sentencing for both simultaneous possession of drugs and a firearm and possession of drugs with intent to deliver did not violate double jeopardy principles. The court stated that even though convictions for both of these offenses appeared to violate the defendant's double-jeopardy rights because possession of a controlled substance with intent to sell is an included offense within simultaneous possession of a controlled substance and a firearm, the real issue, based on the holding in *Hunter*, was whether the legislature intended for the two offenses to be separate offenses where the same conduct violates two statutory provisions. *Id.* The court found that the legislature had made it clear that it intended

for these two offenses to be separate offenses and that it intended to assess an additional penalty for simultaneously possessing controlled substances and a firearm; thus, no double-jeopardy violation occurred. *Id.*

Here, by amending section 5-1-110 in 1995, the legislature explicitly indicated its intent that first-degree murder and its underlying felony be considered separate offenses and that separate convictions and sentences are authorized for each offense. Thus, according to ·the Court's holding in *Hunter*, which has been cited with approval by our state supreme court in both *Flowers* and *Rowbottom*, Hudson's separate convictions and sentences for first-degree murder and aggravated robbery do not violate the double-jeopardy provisions contained in the state and federal constitutions. Hudson argues that his situation is different than in *Hunter*, because aggravated robbery is ·the underlying offense for first-degree murder and because the same force was used to commit both offenses. However, in *Rowbottom, supra*, the court found that possession of a controlled substance with intent to sell was an included offense within simultaneous possession of a controlled substance and a firearm, yet concluded that the conviction and sentence for both offenses did not violate the defendant's double-jeopardy rights because the legislature intended to authorize separate punishments for each offense. *Id.* In fact, the court stated that the situation in *Rowbottom* was analogous to a defendant being convicted of both felony murder with aggravated robbery as the underlying felony, and aggravated robbery separately, which violated section 5-1-110(a)(1) prior to the 1995 amendment. Thus, Hudson's argument in this regard is without merit, and the trial court did not err in denying his motion to prohibit the imposition of sentence for both first-degree murder and aggravated robbery.

In his final point, Hudson argues that the trial court failed to perform its gate-keeping function in allowing Officer Charles Rexford to testify as an expert in blood-spatter analysis. Prior to trial, Hudson moved to subject any expert testimony offered by the State to a pretrial hearing pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The parties subsequently agreed that the only expert testimony subject to such a hearing was the State's blood-spatter expert, Officer Charles Rexford. At the *Daubert* hearing, Rexford testified that he was a detective with the Washington County Sheriff's Department and that he had been involved in criminal investigation for more than twenty-five years.

He stated that he had taken basic and advanced courses in basic blood-pattern analysis in 1995, as well as another advanced course on computerized blood-stain pattern analysis in 1999. In addition, Rexford testified that he had taken other courses on processing physical evidence. According to Rexford, he had worked more than 100 cases involving blood stains. He also stated that he had previously been certified as an expert in blood-spatter analysis by an Arkansas court and had testified as such. Rexford testified that blood-stain analysis is a known and accepted scientific discipline that has been used for many years, and he stated that the rate of error was between five and ten percent. He further testified that there are publications, such as the Forensic Journal and the International Association of Blood Pattern Analysis, which discuss studies done using blood-spatter analysis.

Rexford explained that his examination of the crime scene in this case focused on locating individual blood spatters, from which he could determine the direction of the blows struck to Vowell. He testified that he uses a small microscope and that he measures different blood stains to determine where they converge to an impact angle. He also described the characteristics of blood and what conclusions could be drawn from such observations based on the known physical properties of blood. He stated that the conclusions to which he would testify from his blood-spatter analysis in this case were the location of the attacker, the direction and type of force used in the attack, and the estimated number of blows that Vowell sustained based on the blood-stain patterns.

Hudson argued that blood-stain analysis was a novel science and that this expert testimony was not reliable or relevant under the standards set out in the *Daubert* case. The trial court disagreed and ruled that Rexford was qualified as an expert in blood-spatter analysis and that it was not a novel science. The court found that Rexford's testimony would be relevant and helpful to the jury and that the testimony was not likely to confuse or mislead the jury. The court stated that the defense's objections went to the weight of the evidence and not to its admissibility.

On appeal, Hudson again contends that this testimony was not admissible under *Daubert* because it did not assist the trier of fact in understanding or determining a fact in issue in this case. Hudson argues that Rexford's testimony established nothing that the medical examiner did not state in his testimony and that Rexford's conclusions could have been supplied by any police

officer present at the crime scene. Hudson also asserts that Rexford had "precious little training and background in this specialty."

Arkansas Rule of Evidence 702, which governs expert testimony, states that if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In *Farm Bureau Mutual Insurance Co. of Ark. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000), the supreme court adopted the United States Supreme Court's interpretation of Federal Rule of Evidence 702 in *Daubert, supra.* Under *Foote* and *Daubert,* the trial court must make a preliminary assessment of whether the reasoning or methodology underlying expert testimony is valid and whether the reasoning and methodology used by the expert has been properly applied to the facts in the case. Our supreme court has also adopted the subsequent Supreme Court decision in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999), which determined that Rule 702 applies equally to all types of expert testimony and not simply to scientific expert testimony and that they must be shown to be both reliable and relevant. *See Coca-Cola Bottling Co. v. Gill,* 352 Ark. 240, 100 S.W.3d 715 (2003).

Rexford's testimony established that he had received extensive training and education in blood-spatter analysis, as well as experience in conducting this analysis at crime scenes. It was also established that blood-spatter analysis was a well-recognized science, which has been in existence for many years. Also, as the State argued at the *Daubert* hearing, there have been a number of Arkansas cases where blood-spatter testimony has been elicited from a witness qualified as an expert in the field, although introduction of this evidence was not an issue raised on appeal in those cases. *See, e.g., State v. Goff,* 349 Ark. 532, 79 S.W.3d 320 (2002); *Fudge v. State,* 341 Ark. 759, 20 S.W.3d 315 (2000); *Jones v. State,* 11 Ark. App. 129, 668 S.W.2d 30 (1984). In fact, Rexford testified that he had previously been certified by a trial court in this state as an expert and had testified regarding blood-pattern analysis. Thus, we hold that the reliability of this expert testimony was established.

Hudson's argument that Rexford's testimony was not relevant or admissible under Rule 702 because it did not assist the

trier of fact in understanding an issue in the case, is likewise without merit. Not only did Rexford's testimony corroborate the medical examiner's findings, it was also consistent with the other testimony and evidence of the attack. Moreover, his testimony helped to establish the directionality and type of force used in the attack, the location of the attackers, and the estimated number of blows that Vowell sustained. Thus, Rexford's testimony of what he observed not only corroborated other evidence regarding the murder, but also assisted the jury in understanding the manner of the attack and what was found at the crime scene. Consequently, the blood-spatter expert testimony was both reliable and relevant, and the trial court did not err in admitting this testimony under Rule 702.

Affirmed.

ROBBINS and BAKER, JJ., agree.