Ledell LEE *v.* STATE of Arkansas

CR 96-466                                       931 S.W.2d 433

Supreme Court of Arkansas
Opinion delivered October 7, 1996

*Wallace, Hamner, and Adams,* by: *Dale E. Adams,* for appellant.

*Winston Bryant,* Att'y Gen., by: *J. Brent Standridge,* Asst. Att'y Gen., and Stuart A. Cearley, Law Student Admitted to Practice Pursuant to Rule XV(G)(1)(b) of the Rules Governing the Admission to the Bar, for appellee.

ANDREE LAYTON ROAF, Justice. Appellant Ledell Lee appeals his convictions for kidnapping and rape. He was sentenced to sixty years on each conviction, to be served concurrently. Lee argues that there was insufficient evidence to sustain the verdicts without erroneously admitted DNA evidence. He contends that the DNA evidence was inadmissible because the state failed to establish a proper chain of custody for blood samples and tissue swabs used to perform the DNA analysis. We find no error and affirm.

Lee was convicted of the kidnapping and rape of a seventeen-year-old girl in Jacksonville, Arkansas. The victim was abducted

from her sister's home on the night of November 27, 1990, and was raped in a wooded area behind the house. The victim described her attacker as a tall, black male, but was unable to identify him because he prevented her from seeing his face during the attack. Evidence from a rape-kit examination performed on the victim was submitted to the state crime laboratory for analysis. Hair combings from the victim's clothing contained two Negroid hairs, and semen was identified in vaginal swabs taken from the rape examination. After the analysis, the rape-kit evidence was stored by the state crime lab in a secure freezer in May, 1991. Also, two days after the rape, Jacksonville police officers processed the victim's home for evidence and took latent fingerprints from inside and outside the residence. The case remained in an inactive status until Lee became a suspect in February, 1993.

Hand prints and fingerprints, hair samples, and a blood sample were taken from Lee in February, 1993. Lee's palm print matched a palm print found on a bedroom window at the victim's home. Lee's blood was tested along with the victim's blood and the vaginal swabs from the rape kit. The FBI agent who performed the DNA analysis concluded that the probability of the assailant being someone other than Lee was one in eighty-three million from the black population. The palm print and the DNA profile evidence essentially comprised the state's case against Lee.

### 1. Sufficiency of the Evidence

Lee contends that because the state failed to establish an adequate chain of custody for blood samples used in the DNA analysis, his motion for a directed verdict should have been granted. Lee submits that the motion for directed verdict should have been granted because, without the erroneously admitted DNA testimony, the evidence of the matching palm print was insufficient to connect him to the assault on the victim. Although Lee combines his argument concerning the sufficiency of the evidence with his challenge to the admissibility of the DNA evidence, the preservation of an appellant's right to freedom from double jeopardy requires that we review the sufficiency of the evidence prior to examining trial error. *Passley* v. *State*, 323 Ark. 301, 915 S.W.2d 248 (1996). Consequently, we address Lee's challenge to the sufficiency of the evidence before considering his other assignments of trial error. In determining the sufficiency question, we disregard any alleged trial errors. *Young* v. *State*, 316 Ark. 225, 871 S.W.2d

373 (1994).

On appeal, we determine whether the evidence in support of the verdict is substantial. Substantial evidence is that which is forceful enough to compel reasonable minds to reach a conclusion one way or another. *Id.* In a criminal case, we review the evidence in the light most favorable to the state, and consider only that evidence which supports the guilty verdict. *Id.*

In the instant case, the victim testified that she was home alone with her three-year-old nephew and three-month-old niece on the evening of the assault. She stated that while she was rocking her niece, a man came up behind her, put an arm around her neck, struck her on the head and face with an iron, forced her out of the house and into a wooded area, where he raped her, choked her, and held her head under water in a ditch until she lost consciousness. She testified that when she regained consciousness, she was lying face up in the ditch, wearing only a bra and a tee shirt. She returned home and was taken to a hospital emergency room where the rape examination was performed. The victim described her attacker as a tall, black man with large hands.

Dr. George McCrary, a physician who was working at the Rebsamen Regional Medical Center Emergency Room on the night of the assault, testified that he examined the victim and performed the rape-kit examination. He stated that she had lacerations on the forehead and nose, choke-mark-type bruises on her neck, and scratches on her leg. He further testified that there was an abrasion on her vagina and mud and leaves in the area of her groin. Kenny King, a latent fingerprint examiner employed by the state crime lab, testified that the right-palm print taken from Lee matched State's Exhibit Thirty-One, which was a latent-palm print recovered from the crime scene. Robert Baker, a lieutenant with the Jacksonville police department, testified that he lifted eleven latent fingerprints from inside and outside the victim's house two days after the assault. He identified State's Exhibit Number Thirty-One as a latent print obtained from the outside glass of a bedroom window that was believed to be the assailant's point of entry, because it was unlocked on the night of the assault.

Harold Deadman, a special agent in the DNA-analysis unit of the FBI laboratory in Washington, D.C., testified that he performed an analysis of blood samples from Lee and the victim, and two

vaginal swabs taken from the victim after the rape. Deadman testified that he obtained a match with four of six probes used in comparing the known blood sample from Lee with the male fraction of DNA obtained from the vaginal swabs; he stated that the results from two of the probes were inconclusive for purposes of matching. Based on this analysis, Deadman testified that the probability of finding someone in the black population who had the same DNA as Lee would be one in eighty-three million.

■■  Clearly, there was overwhelming evidence of the rape and kidnapping from the testimony of the victim and the emergency-room physician. Moreover, the evidence linking Lee to the assault was substantial. This court has held that fingerprints can constitute evidence that is sufficient to sustain a conviction. *Howard* v. *State*, 286 Ark. 479, 695 S.W.2d 375 (1985); *Ebsen* v. *State*, 249 Ark. 477, 459 S.W.2d 548 (1970). Furthermore, semen in the vaginal swabs taken from the victim and Lee's blood matched with the chance of an identical match being one in eighty-three million. We hold that the evidence was sufficient to support Lee's conviction for the crimes charged and that the trial court did not err in denying Lee's motion for directed verdict.

### 2. Chain of Custody

We next consider Lee's assertion that the trial court erred in admitting the DNA evidence and testimony because the State failed to establish a proper chain of custody for the blood samples and vaginal swabs used to perform the DNA analysis. Lee's chain of custody argument is twofold. First, he asserts that there is a break in the chain of custody with respect to State's Exhibits Forty-Four and Forty-Five, which are the vials that contained the blood drawn from the victim and Lee on February 18, 1993. These blood samples were drawn by Lisa Holt, an employee of Crestview Family Clinic in Jacksonville. Holt testified that she drew two vials of blood from Lee on the morning of February 18, 1993, and two vials of blood from the victim later that day. She stated that she placed her initials and the date on the vials and handed them to the officers who accompanied Lee and the victim to the clinic. When it was called to her attention during cross-examination that her initials were not on any of the vials in either exhibit, Holt testified that she did not understand why because it was her normal procedure to initial such evidence, and that she "must have been told not to put them [her initials] on." However, on recall, Holt further observed

that the vials were properly dated and labeled with the names of the victim and Lee, and she recognized her handwriting on the vials. Lee objected to the introduction of Exhibits Forty-Four and Forty-Five and argued to the trial court that Holt could not identify the vials because they did not bear her initials as she had originally testified; the trial court overruled the objection.

Lee's second chain of custody objection pertains to the testimony of Dr. Deadman, the FBI special agent who provided the DNA analysis and DNA profiling testimony at trial. Lee first objected to the introduction of the autorads (films of matched DNA bands) prepared by Deadman in his analysis of the vaginal swabs and blood samples drawn in February, 1993, and in a subsequent analysis performed with a second blood sample drawn from Lee in August, 1994. Lee argued to the trial court that Deadman did not testify as to where the blood samples or the vaginal swabs came from, only that he had received them, and that this omission constituted a break in the chain of custody. The trial court overruled the objection, and the autorads, State's Exhibits number Fifty-Nine through Seventy, were received into evidence. Later, at the conclusion of Deadman's testimony, the State sought to introduce all of its exhibits, numbers One through Seventy, and Lee again objected to the introduction of the autorads. Lee argued that the State had not established a chain of custody to support either the first or second DNA analysis because of the chain of custody lapse in Deadman's testimony and that of Lisa Holt. The trial court again overruled Lee's objection and allowed the State's exhibits to be introduced into evidence.

With regard to Deadman's testimony, Kermit Channel, a forsenic serologist employed with the state crime lab, testified that he sent the blood samples drawn from Lee and the victim in February, 1993, along with the vaginal swabs from the rape kit to the FBI laboratory on March 1, 1993. Phil Rains, also a state crime lab serologist, testified that he sent the second blood sample drawn from Lee in August, 1994, to the FBI on September 6, 1994, along with the probed membrane which had been submitted by the FBI following the first analysis in 1993. Deadman's testimony was as follows:

> Q. Doctor, did you have occasion to receive a known blood sample from [the victim] and a known vaginal swab from a rape kit of [the victim] from the Arkansas State Crime

Laboratory?

A. Yes, I did.

Q. And when did you receive that?

A. In March of 1993, March 5th, 1993.

Q. And in what form did you receive that blood sample of [the victim]?

A. Typically, and in this case we received it in the form of a dried stain....

Q. And that is how you received [the victim's] blood?

A. Yes.

Q. Okay. And in what form did you receive the swab?

A. The swab would have been—there are actually two swabs. The sticks of the swabs were broken. The swabs are contained in a, in a small envelope, a small envelope.

Q. And did you also have occasion to receive a known blood sample from the defendant, Ledell Lee?

A. Yes, I did.

Q. And in what form was that received?

A. It was received as a dried stain also. ...

A. ...Sometime last fall, early in the fall the FBI Laboratory began using two additional probes and at that time the membrane was re-submitted to the laboratory and the DNA on the membrane was subjected to two additional probes and then the results from that additional probing were combined with the earlier results, another report was generated, and then I returned the membrane.

Q. Okay. The, this, the — when the probed membrane that you created was resubmitted to the crime laboratory, was there also a new sample of the defendant's, Ledell Lee's blood sent to the FBI Laboratory?

A. Yes. A second sample of his blood was submitted.

Deadman was not asked when he received the second blood sample.

This court has stated that blood samples, which are considered interchangeable items, require a more conclusive chain of custody than items of evidence which are subject to positive identification. *Neal* v. *State*, 298 Ark. 565, 769 S.W.2d 414 (1989). However, evidentiary matters regarding the admissibility of evidence are within the sound discretion of the trial court, and rulings in this regard will not be reversed absent an abuse of discretion. *Harris* v. *State*, 322 Ark. 167, 907 S.W.2d 729 (1995); *Hubbard* v. *State*, 306 Ark. 153, 812 S.W.2d 107 (1991).

■■    Additionally, we have stated that the purpose of establishing a chain of custody is to prevent the introduction of evidence that is not authentic or that has been tampered with. *Harris* v. *State*, *supra*; *Pryor* v. *State*, 314 Ark. 212, 861 S.W.2d 544 (1993). The trial court must be satisfied, within a reasonable probability, that the evidence has not been tampered with. *Harris*, *supra*; *Gardner* v. *State*, 296 Ark. 41, 754 S.W.2d 518 (1988). It is not necessary that the State eliminate every possibility of tampering. *Id*. The mere possibility of access to blood, where there is no evidence of tampering, is not enough to render test results from that blood inadmissible. *See Turner* v. *State*, 258 Ark. 425, 527 S.W.2d 580 (1975).

In *Phills* v. *State*, 301 Ark. 265, 783 S.W.2d 348 (1990), the court could not determine the nature of the appellant's objection to a serologist's testimony regarding blood samples. The court concluded that the objection had to do with the adequacy of the foundation laid for the testimony, stating that:

> Appellant may be arguing that [the] foundation [which was laid] was inadequate. As in *Munnerlyn* v. *State*, 264 Ark. 928, 576 S.W.2d 714 (1979), appellant does not allege that the samples had been tampered with and there is nothing in the record to suggest such a possibility. It is not necessary that every moment from the time evidence comes into the possession of a law enforcement agency until it is introduced at trial be accounted for by every person who could have conceivably come into contact with it. It is only necessary that the trial judge, in his discretion, be satisfied that the evidence presented is genuine and, in reasonable probability, has not been tampered with. The trial judge did not abuse his discretion in allowing the result of the serological test of appellant's blood sample.

*Id.* Likewise, in *Neal* v. *State, supra,* the appellant argued an inadequate chain of custody resulting from blood samples that were not properly stored, leading to the possibility of tampering and contamination. However, this court did not accept this argument noting that the trial court had determined that the integrity of the evidence had been sufficiently established. While we were sympathetic to the defendant's concerns in *Neal,* we could not say that the trial court abused its discretion in admitting the evidence.

■ Here, we cannot say that the trial court abused its discretion in admitting the DNA evidence and testimony. With regard to the rape kit (and the swabs contained therein), the abstract does not reveal that Lee made a specific objection to its introduction. Instead, Lee made an objection to the autorads prepared at the FBI lab, which were made using the swabs. Arguably, this can be seen as a waiver of the right to raise this point on appeal. *See Gibson* v. *State,* 316 Ark. 705, 875 S.W.2d 58 (1994). However, even on the merits, the testimony reveals a continuous chain of custody from the time the rape kit was used to examine the victim until it was submitted to the FBI for DNA testing. Deadman in fact testified when and from whom he received this evidence.

Likewise, the blood samples taken from Lee and the victim on February 18, 1993, reveal a successive chain of custody. The same can be said for the sample taken from Lee on August 26, 1994. While Holt testified that she did not follow her normal routine by failing to initial the February 18 samples, she unequivocally stated that the labels on the blood samples were written in her own handwriting. Deadman testified to receiving both of the blood samples, although he did not specify the date he actually received the second sample of Lee's blood.

■ The trial court determined that the integrity and authenticity of the evidence had been clearly established. There is no evidence in the record which reflects any actual tampering or contamination of the samples, or a significant gap in the chain of custody. Absent evidence of tampering, the trial court's ruling will not be disturbed unless there is a clear abuse of discretion. *See Gomez* v. *State,* 305 Ark. 496, 809 S.W.2d 809 (1991). We find no abuse of discretion in admitting this evidence.

Affirmed.