Robert Todd BURMINGHAM *v.* STATE of Arkansas

CR 99-678 27 S.W.3d 351

Supreme Court of Arkansas
Opinion delivered September 21, 2000

98

*Randel Miller,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Sandy Moll,* Ass't Att'y Gen., for appellee.

RAY THORNTON, Justice. Appellant was convicted of rape, kidnapping, and aggravated robbery, and sentenced to eighty years in the Arkansas Department of Correction. The victim, S. W., a seventeen-year-old girl, was driving home from Lonoke to Cabot on the night of July 11, 1997. A car, driven by appellant, Robert Todd Burmingham, overtook her and signaled for her to pull over by flashing a blue light. Thinking she was going to receive a ticket for speeding, she stopped and turned toward the passenger seat to get her driver's license. When she turned back toward her window, she saw appellant standing beside her window wearing a ski mask and carrying a gun. She was told to cover her face with a shirt, to get out of her car and into appellant's vehicle, and was then driven to a remote house, where she was compelled to have sex with her assailant. Appellant raises seven points on appeal and, finding no reversible error, we affirm the convictions.

■ Because of our consideration of prohibitions against double jeopardy, we review the sufficiency of the evidence prior to examining trial error. *Lee v. State*, 326 Ark. 229, 931 S.W.2d 433 (1996). In determining the sufficiency question, we disregard any alleged trial errors. *Id.*

■■ Appellant urges that the trial court erred in denying his motion for a directed verdict. Motions for directed verdicts are treated as challenges to the sufficiency of the evidence. *McFarland v. State*, 337 Ark. 386, 989 S.W.2d 899 (1999). We have also noted that this review includes an evaluation of otherwise inadmissible evidence. *Harris v. State*, 284 Ark. 247, 681 S.W.2d 334 (1984).

■ In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998). We do not reweigh the evidence but determine instead whether the evidence supporting the verdict is substantial. *McFarland, supra*. We affirm a conviction if substantial evidence exists to support it. *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991). Evidence, whether direct or circumstantial, is sufficient to support a conviction if it is forceful enough to compel reasonable minds to reach a conclusion without having to resort to speculation or conjecture. *Id.* We do not, however, weigh the evidence presented at trial, as that is a matter for a factfinder. *Wilson, supra*. Nor will we weigh the credibility of the witnesses. *Id.*

We have also noted that the testimony of the rape victim satisfies the substantial-evidence requirement in a rape case. *Prater, supra.*

Here, the trial court denied all motions for a directed verdict. To determine whether the trial court erred, it is necessary to review the trial testimony. First, S. W., the victim in the case, testified that on the evening of July 11, 1997, she was traveling home from Lonoke to Cabot. She stated that she was driving too fast and she noticed a car following closely behind. The car turned on a blue light and she pulled over. The victim testified that when she leaned over to get her driver's license a man in a ski mask with a gun appeared at her window. The man gave her a shirt and told her to cover her face. She was then told that he was not going to hurt her but that his "buddy" was going to take her car and go to Little Rock to pick up his girlfriend. The victim further stated that he forced her into his car and drove her to a remote location and raped her vaginally. She was forced to remove her clothes and to perform oral sex. S. W. also testified that the rapist smoked cigarettes and told her if she would "kiss him back" he would not hurt her. After the rape, she was told to get dressed, and was taken to a field, where she was told to lie face down until he was gone.

In addition to the foregoing testimony, S. W. was able to give a meticulously detailed description of where the rape occurred. Her description of the house included the following information: (1) the house was off a gravel road; (2) there were steps leading onto a porch with a screened door; (3) the door opened from left to right and was opened with some difficulty; (4) there was a rocking chair, which had a loose arm, on the inside to the left of the door; (5) the kitchen was also to the left of the front door; (6) the house had a bedroom; (7) the bathroom had a wooden cabinet with a sink in it; and (8) the living room had hardwood floors. S. W.'s description of the house matched that of a vacant home owned by appellant's father. The victim also gave a description of the car in which she was kidnapped. She stated that the car was a two-door, with bucket seats, and did not have air conditioning. Her description matched a car owned by appellant's wife.

Kermit Channel from the Arkansas State Crime Laboratory also testified at trial. He explained the process used in establishing a DNA profile. Mr. Channel also testified that the semen sample obtained from S. W.'s rape kit allowed him to prepare a DNA profile

on her attacker. He stated that appellant's DNA profile matched S. W.'s rapist and that there was one chance in a trillion that the DNA on the vaginal swab recovered from S. W., following the rape, came from someone else.

After reviewing the evidence, we have determined that there was substantial evidence to support appellant's convictions. Specifically, we hold that there was evidence, both direct and circumstantial, that was forceful enough to compel reasonable minds to reach a conclusion without having to resort to speculation or conjecture. Accordingly, the trial court's denial of appellant's motions for directed verdict is affirmed.

Appellant next contends that the trial court erred when it refused to provide him with funds to hire a DNA expert and a private investigator. Appellant has divided this issue into two questions. He outlines the issues as follows: (1) whether the trial court erred in ruling that appellant was not indigent; and (2) whether an indigent defendant that has been provided counsel from a collateral source is entitled to state-funded auxiliary services. Appellant also questions whether the trial court in all cases where the key evidence is DNA should always provide funds for indigent defendants to have the services of a DNA expert.

First, we address the question of whether the trial court erred in determining that appellant was not indigent. On appeal, the standard of review is whether the trial court abused its discretion in finding that petitioner was not indigent. *Hill v. State*, 304 Ark. 348, 802 S.W.2d 144 (1991). In *Hill*, we outlined the criteria to be used in determining the indigency of a defendant. We stated:

> This court has considered indigency on a case-by-case basis, as have most other jurisdictions. Most appellate courts have held that a person need not be destitute to qualify as an indigent. The burden of establishing indigency is on the defendant claiming indigent status, and the defendant who seeks indigent status is responsible for verifying the motion to proceed as a pauper with a supporting affidavit as set out in our Rule 28.
>
> While there is no bright-line test for indigency, which is a mixed question of fact and law, some of the factors to be considered are: (1) income from employment and governmental programs such as social security and unemployment benefits; (2)

money on deposit; (3) ownership of real and personal property; (4) total indebtedness and expense; (5) the number of persons dependent on the appellant for support; (6) the cost of the transcript on appeal; and (7) the likely fee of retained counsel for the appeal.

. . .

The ability of bystanders such as friends and family members to post bond or assist with expenses is not a factor in determining the appellant's indigency since indigency of the appellant does not depend on the financial position of his family and friends. Bystanders have no obligation to the state. An exception could be made, however, where the appellant has control or complete discretionary use of funds raised by others.

*Hill, supra.* (citations omitted).

In the present case, appellant filed an affidavit of indigency on March 10, 1998. In that affidavit, appellant declared:

I have been incarcerated since mid-September, 1997, in Lee County Jail on a total bail of $400,000.

I am married and have two children. I farm for my father-in-law, and he pays me a salary. In the off-season he pays me $250 per week, which is paid over to my wife to help with her support and our children's support since I am in jail.

My wife, Angie, also works and it takes all the money she makes plus the above mentioned to make ends meet now that I am in jail.

We are buying the mobile home we live in that is situated on approximately eight acres of land in which my parents have a life estate. At their deaths this land goes to my son. Another eight acres of land that they live on, they have a life estate in. When they die I will own 1/5 of that eight acres.

I also farm seventeen acres of land that my sister owns. I get approximately $5,000 per year as my part of that. That has already been paid for 1997 and spent or is being spent for support of my wife and children, and I expect no more income from that as long as I am incarcerated.

I have no savings, stock, bonds, mutual funds, securities or anything of that nature that could be converted to cash.

> The only personal property I own is jointly with my wife and is of little market value. It is needed by her for use for her and the children: things such as older used cars, furniture, appliances, and household goods.

* * *

> I have no cash, bank accounts, real estates or personal property of any significance. I cannot make bail, so I will remain in jail pending trial.

After reviewing appellant's affidavit, we note that it does not give totals as to how much money appellant had at the time of his petition or how much debt he had at the time of his petition. It appears that a hearing was held on January 16, 1998, to discuss appellant's petition to be declared indigent so that he could receive funds to hire a private investigator and a private DNA expert. This hearing is not in the record.

██ Based upon the record before us, appellant did not meet his burden of showing that the trial court erred in determining that he was not indigent. Without a record of the hearing before the trial court on the question of indigency, we cannot determine that the trial court's finding that appellant was not indigent was an abuse of discretion. Accordingly, we affirm the trial court's finding that appellant was not indigent.

Because the trial court did not commit error with regard to this finding, the remaining issue of whether an indigent criminal defendant is entitled to receive state funds for the hiring of a DNA expert or a private investigator is not presented by the facts of this case. Additionally, we note that appellant was not prejudiced by this finding because he was able to obtain the services of a DNA expert for use at trial without receiving state funds.

In his next point on appeal, appellant argues that the trial court erred when it allowed the State's expert witness to testify that appellant was the person who produced the DNA found in the victim's rape kit. Specifically, appellant contends that an expert may only testify as to the probabilities of some other individual contributing the DNA found in the rape kit, but may not express an opinion that the DNA evidence shows that appellant was the donor of the DNA material found on the victim's vaginal swab.

The testimony that is objected to is as follows:

Q: [MR. LONG, STATE'S ATTORNEY]: And what is the probability of finding someone random, in the world, who matches on all fifteen points as that does?

A: [MR. CHANNEL OF THE ARKANSAS CRIME LABORATORY] The statistics that would generate from that would be one in one trillion. And what that does, we're trying to determine how rare or how common that DNA profile is in the general population and specifically in the Caucasian population. So that gives me the ability to render an opinion on that to say that the DNA profile on the DNA vaginal swabs from S.W. came from that of Robert Burmingham.

Q: Period?

A: Yes, that's correct.

Q: When you reach that order of numbers you're not talking about probabilities any more. What you are saying is, it is him?

A: Right —

MR. MILLER: [DEFENSE ATTORNEY] Your honor, I object —

DR. CHANNEL: Right, It's my opinion that it's him.

THE COURT: Hold on, Mr. Channel. What's the basis of your objection?

MR. MILLER: This witness has just testified as to probabilities. He cannot, based on what he just said, testify with absolute certainty that in his; it can only be him. He can testify to the probability, but not to identify him as the only person to the exclusion of all others. I don't think —

MR. LONG: He just said that he could. Now, if Mr. Miller wants to bring an expert witness that says he can't, then fine, we can wait for him.

THE COURT: The objection is overruled. You may proceed.

■ Appellant argues that an expert witness can only express statistical probabilities of a DNA match, and must refrain from expressing an opinion as to the origin of the tested DNA material. Appellant's argument must fail. We first note the testimony by the State's expert that the DNA material on the swab was identical to that obtained from a blood test from appellant in all fifteen points analyzed, and that the probability of finding such a match would be one in one trillion. This scientific analysis was not challenged by appellant's DNA expert. We also note that it has been nearly a decade since our decision in *Prater, supra,* where we held that DNA testing is a reliable scientific procedure. Based upon the undisputed

testimony in this case, we hold that the trial court did not err in permitting the expert to testify that in his opinion appellant was the source of the DNA material found on the victim's vaginal swab.[1]

In his next point on appeal, appellant contends that his due process rights were violated when the trial court allowed the State to pursue a line of questioning regarding appellant's ability to retest the DNA evidence. Specifically, appellant argues that because the State introduced evidence that appellant had an opportunity to have the DNA evidence retested the burden of proof was shifted to appellant to prove his innocence instead of the State having to prove his guilt.

The testimony that the trial court allowed and that the appellant is now challenging is as follows:

> Q [Prosecuting Attorney, Mr. Long]: Now, is it your practice in your laboratory to obtain a sample for further testing by the defense if they so desire?
> A [Kermit Channel] [DNA expert from the State Crime Laboratory]: Yes, we do.
> Q. And —
> MR. MILLER[DEFENSE ATTORNEY]: Your honor, may we approach?
> MR. MILLER: Your honor, I object to him making the argument to the jury or asking questions about saying this was available to be tested. We had no obligation to test this. And if we ask any questions that would open the door to that, I don't think that would be proper for them to say "this was available and they could have tested it."
> MR. LONG: Judge, I think I'm entitled to do that because if I don't, I'm sure we're going to hear the argument, or I might possibly hear the argument "we don't know what somebody else's results would be." And I want to be able to answer that argument by saying they are not able to prove anything, but if they wanted to question the results here they are. I'm not aware it's not commenting on the accused's failure to take the stand. The prosecution can always comment on the failure of other evidence - other proof of the defense. There is nothing improper about that.
> THE COURT: Is that an objection, Mr. Miller?
> MR. MILLER: Yes, it is.

---

[1] During oral arguments, appellant challenged the accuracy of the State's DNA evidence on the basis that the evidence was the product of "junk science." This argument, however, was not raised at trial or in appellant's brief. Thus, we will not address it on review.

THE COURT: Okay. It's overruled.

Q. [MR. LONG]: Now, the defense requested, and you did provide to the defense, the material in your file in connection with this DNA testing?

A. [MR. CHANNEL]: Yes, I did.

Q. Does that material indicate the availability of the additional material for testing?

A: Yes, it does.

Q: And was any such material requested from you for testing?

A: No, it was not.

 Appellant's argument is misplaced. The record reveals that the testimony elicited from Mr. Channel by the State merely established the availability of the DNA sample to be retested by any party. Mr. Channel's testimony did not imply that it was appellant's responsibility to have the sample retested. We hold that the trial court did not abuse its discretion in allowing the State to introduce this line of testimony.

In his fifth point on appeal, appellant argues that the trial court erred in permitting the testimony of another alleged victim of a "blue light rape" that occurred in Marianna. The State introduced this evidence pursuant to Rule 404(b) of the Arkansas Rules of Evidence. On this issue the trial court found that "the State will be permitted to offer evidence of a rape in Marianna, Arkansas, allegedly committed in exactly the same fashion as evidence of method of operation, similar scheme (plan) or intent."

Rule 404(b) of the Arkansas Rules of Evidence states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

 We have recognized that the list of exceptions to inadmissibility under Rule 404(b) is not an exclusive list but rather represents examples of the types of circumstances where evidence of other crimes or wrongs or acts would be relevant and admissible. *Lindsey v. State*, 319 Ark. 132, 890 S.W.2d 584 (1994). The test for establishing motive, intent, or plan as a Rule 404(b) exception is whether the evidence of the other act has independent relevance.

*Haire v. State*, 340 Ark. 11, 8 S.W.3d 468 (2000). Evidence is indisputably relevant if it proves a material point and is not introduced solely to prove that the defendant is a bad person. *Id.* In our review of the admission or rejection of evidence under Rule 404(b), we have noted that trial courts have broad discretion in deciding evidentiary issues, and their decisions are not reversed absent an abuse of discretion. *Lindsey, supra.*

In a case involving facts strikingly similar to the one now on review, a former deputy sheriff was convicted of raping a woman whom he stopped with his patrol car. *Dillon v. State*, 311 Ark. 529, 844 S.W.2d 944 (1993). In analyzing the issue, we stated:

> [T]he circuit court allowed Brenda Kaup, Dillon's purported victim on October 12, 1990, to testify under A.R.E. 404(b) because her testimony was evidence that Dillon followed a particular plan, or *modus operandi*, with Tammy Falcone. Dillon's plan, as revealed by Kaup's testimony, was consistent with the circumstances depicted in Falcone's testimony. According to the respective testimony, both women were unaccompanied when they were pulled over. Both women were accused of crossing the center line, and both were ordered to get into the patrol car. Both women had family out of town: Falcone's husband was in Saudi Arabia, and Kaup's family lived out of state. In Kaup's case, she stated that Dillon threatened to take her in for DWI but said perhaps he could work something out. At that point he obliged her to expose herself to him under the pretext of searching for drugs. He then released her and followed her to her babysitter's house.

*Dillon, supra.* After reviewing the testimony, we explained that "we have held that *modus operandi* evidence is admissible in rape cases to prove a common plan. *Id. (citing Tarkington v. State*, 250 Ark. 972, 469 S.W.2d 93 (1971)). We then went on to note that "this situation fits squarely within that holding" and affirmed the trial court's decision to allow the 404(b) evidence to be introduced at trial. *Id.*

To determine whether the trial court erred in allowing evidence of another act to show whether a *modus operandi* was used, we must review the other victim's testimony. The witness testified that on the evening of January 9, 1996, she was driving home from Marianna to Forrest City. She also stated that she was speeding and she could see a car following her. The witness then testified that the car following her turned on a blue light and pulled her over.

She further stated that she thought she was going to receive a ticket so she was looking for a driver's license in her purse when a man in a ski mask with a gun appeared at her car door. The witness also testified that the man told her to cover her eyes with a sweatshirt. He told her to get out of her car and that he would not hurt her but that he wanted her car. He said that he and his "buddy" would just take her down the road and drop her off. The rapist told her to remove her clothes and that he was not going to hurt her. The witness then stated that the man was a smoker who took her to a "field road" and raped her vaginally. She finally testified that after the rape he told her to put her clothes back on, drove her down "the road a little ways," stopped the car, and took her to the edge of the woods where he made her lie face down with the sweatshirt on her head until he was gone.

At the outset we note that the two rape kits each supported an expert opinion that the source of the DNA was the same individual. Comparing this witness's testimony to the events described by S.W., it appears that appellant performed his rapes following the same *modus operandi* on both victims. Specifically, both victims were traveling alone at night by automobile. Both were stopped by a man who followed them and pulled them over with a blue light. The rapist in both situations wore a ski mask and forced the victim to cover her face with a shirt. Both victims were assured that they would not be hurt but that the attacker just wanted to use their car. Both victims were vaginally raped. Both victims were taken to a remote area and told to lie face down while the attacker drove away.

We conclude that the other victim's testimony was relevant evidence that appellant followed a particular *modus operandi* with S. W. and that such evidence is admissible in rape cases. As revealed by the other victim's testimony, the *modus operandi* followed during her attack was consistent with the circumstances depicted in S. W.'s testimony. As in *Dillon, supra,* we hold that allowing the other victim to testify was not an abuse of the trial court's discretion.

In his sixth point on appeal, the appellant contends that the trial court erred in granting the State's motion *in limine* to exclude appellant from presenting evidence at trial that while appellant was incarcerated other "blue light" rapes occurred. This ruling pre-

vented appellant from claiming that an unnamed third party committed the crime.

In *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320 (1993), we addressed the issue of admitting evidence intended to incriminate others of a crime charged against a defendant. We considered under what circumstances such evidence would be admitted to prove the defendant did not commit the crime. *Id.* Citing language from two other jurisdictions, which we adopted as our new rule, we stated:

> A defendant may introduce evidence tending to show that someone other than the defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible.

State v. Wilson, 367 S.E.2d 589 (N.C. 1988).

The Supreme Court of California has recognized that a defendant has the right to present evidence of third party culpability but stated:

> [T]he rule does not require that any evidence, however remote, must be admitted to show a third party's possible culpability ... [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt; there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

People v. Kaurish, 802 P.2d 278 (Cal. 1990).

*Zinger, supra.* On review we must determine whether the trial court abused its discretion in refusing to allow the evidence to be admitted. *See Pyles v. State*, 329 Ark. 73, 947 S.W.2d 754 (1997).

Turning to the facts of this case, we do not know what evidence of third-party culpability appellant wished to introduce because appellant did not proffer such evidence for our review. However, assuming that he wanted to merely make the jury aware that other "blue light rapes" had occurred while he was in jail, this evidence would be inadmissible. Specifically, appellant could have only properly introduced evidence which pointed to the guilt of a third party who could be linked to the crime for which appellant

was charged. Presenting evidence that other "blue light rapes" occurred while appellant was in jail without additional evidence does nothing more than create an inference or conjecture as to another unnamed individual's guilt in an unrelated crime. Because appellant failed to provide evidence as to a particular third party's guilt in the rape of S. W., we hold that the trial court did not abuse its discretion in granting the State's motion *in limine*.

In his final point on appeal, appellant argues that the trial court erred in refusing to grant his motion to suppress blood samples taken from him prior to his consultation with an attorney. On March 10, 1998, appellant filed a motion "to suppress all evidence taken as a result of bodily searches (blood, saliva, urine, and hair) for DNA testing taken without his consent on September 11, 1997." The trial court denied appellant's motion. On appeal, appellant contends that the evidence should have been suppressed because he was not permitted to consult with an attorney prior to the giving of the sample in violation of Rule 18.1 of the Arkansas Rules of Criminal Procedure and other constitutional principles, and therefore his right to counsel was violated.

First, it should be noted that our Rule 18.1 does not give a defendant a "right to consult with counsel." It merely states that if a defendant has an attorney, notice of the taking of the samples will be given to that attorney. *Id.* Specifically, Rule 18.1 of the Arkansas Rules of Criminal Procedure states in relevant part:

> (a) Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, a judicial officer may require the defendant to:
>
> (vii) permit the taking of samples of his blood, hair and other materials of his body which involve no unreasonable intrusion thereof; and
>
> (ix) submit to a reasonable physical or medical inspection of his body.
>
> (b) Whenever the personal appearance of the defendant is required for the foregoing purposes, reasonable notice of the time and place of such appearance shall be given by the prosecuting attorney to the defendant and his counsel. Provision may be made for appearances for such purposes in an order admitting the defendant to bail or providing for his release.

*Id.*

■ There is no constitutional right to counsel prior to the filing of formal charges. *See Milholland v. State*, 319 Ark. 604, 893 S.W.2d 327 (1995). Specifically, we have held that when there has been only an arrest and the information or indictment has not been filed, formal proceedings have not begun and no right to counsel attaches. *Id.*

Here, the samples were taken September 11, 1997, and a felony information was not filed against appellant until September 19, 1997. At the time the trial court ordered appellant to give the blood sample, formal charges were not pending and his right to counsel had not yet attached.

It should also be noted that appellant did not have a Fifth Amendment right to consult with an attorney because the evidence he was forced to give to the court was demonstrative in nature. *See Schmerber v. California*, 384 U.S. 757 (1966)(holding that the Fifth Amendment right against self-incrimination does not protect against a defendant being forced to give a blood sample).

■ In this case, appellant was not represented by an attorney at the time the trial court ordered the taking of the samples from appellant. Rule 18.1 only requires giving notice to appellant, and his attorney if he had one. Even if Rule 18.1 had been violated, which we have concluded it was not, we have held that suppression of the evidence is not the appropriate remedy for the State's failure to comply with Rule 18.1 (b). *Moore v. State*, 323 Ark. 529, 915 S.W.2d 284 (1996). Under these circumstances, we hold that the trial court's denial of appellant's motion to suppress was proper and affirm the trial court.

Having found no reversible error, we affirm the trial court on all points.

Affirm.