Jamie Paul BOWEN *v.* STATE of Arkansas

CR 00-702 30 S.W.3d 86

Supreme Court of Arkansas
Opinion delivered November 9, 2000

*James P. Clouette*, for appellant.

*Mark Pryor*, Att'y Gen., by: *James R. Gowen, Jr.*, Ass't Att'y Gen., for appellee.

R OBERT L. BROWN, Justice. Appellant Jamie Paul Bowen appeals from a judgment of conviction for first-degree murder and a sentence of life imprisonment. He raises four points on appeal: (1) there was insufficient evidence to support the judgment and sentence; (2) the trial court erred in not suppressing letters written by Bowen while in jail; (3) the trial court erred in not granting a mistrial, when the prosecutor solicited testimony from a witness that Bowen distributed marijuana; and (4) the trial

court erred in failing to grant a mistrial based on the prosecutor's failure to divulge the names of "309 prisoners," who were used in scouring the crime scene for the murder weapon. We find merit in none of the points raised, and we affirm.

On March 21, 1998, at 1:29 p.m. the Lonoke County Sheriff's Department received a telephone call that a body had been seen lying on the side of the road on Graham Road near Bayou Meto Creek in Lonoke County. Lieutenant Frank Sturdivant and Detective John Andolina responded to the call and found the body of J.R. Glover, age 18, who was deceased. He had been shot once in the back and twice in the left leg. Lieutenant Sturdivant learned that Bowen, age 17, who lived in Jacksonville, was possibly the last person to have contact with J.R. Glover. Jacksonville police officers picked up Bowen on that same day for questioning, and Lieutenant Sturdivant interviewed him. Bowen told the police officers that Glover had come to his apartment that day to return a music tape he had borrowed. He remarked that he and Glover were merely acquaintances. He told the officers that Glover stayed at his apartment in Jacksonville for a short time, and that they smoked marijuana and watched television. He added that Glover was the only person whom he had seen that day.

In the subsequent police investigation, evidence was amassed to justify Bowen's arrest for Glover's murder. On March 23, 1998, he was arrested and charged with first-degree murder. At that time, Bowen made a second statement to the police officers. He told them that on the Friday before the murder, which was March 20, 1998, he dropped off two girls at Southside Junior High School in Jacksonville and went to Cory McKay's house. While smoking marijuana and talking to McKay, Glover's name came up, and McKay told Bowen, "I'm going to kill the motherfucker. He owes me money." Bowen testified that McKay asked him to use his car. Bowen told the officers that the next morning, the morning of the murder, both Glover and McKay separately came to his apartment. After smoking marijuana, McKay asked Glover to go for a ride, and he used Bowen's car. Bowen said that McKay later brought his car back and told him, "I killed that little motherfucker." He told the officers that he did not tell the truth in his first statement on March 21, 1998, because he was scared, and everything was pointing to him as the murderer.

On March 30, 1998, Bowen made a third statement. At that time, he told police officers that on Friday, March 20, 1998, he again went to McKay's house, and McKay showed him a pistol that he had. Bowen handled the weapon. He told police officers that he wanted to add this point to his earlier statement. Lieutenant Sturdivant stated that the murder weapon had been found at the crime scene between March 23 and March 30, 1998.

On December 8, 1999, a two-day jury trial began. The prosecutor's case against Bowen was based on circumstantial evidence. It consisted of testimony from Lieutenant Sturdivant regarding Bowen's statements to police and the gun found at the crime scene. It further consisted of testimony from witnesses that Bowen's maroon vehicle was spotted at the crime scene the day of the murder; that two men were seen standing by the car, one of whom resembled Bowen; that, according to state criminalist Lisa Sakevicius, fibers were found on Glover's clothing consistent with an upholstery sample taken from Bowen's car; that Glover had plans to visit Bowen the morning of the murder; that Bowen was involved in selling marijuana; that Bowen had been told Glover had stolen $1,200 in cash, speakers, Nintendo 64, a phone, stereo, car CD and speakers, and other equipment from his apartment; that, according to Rachel Bennett, Bowen had threatened to "put a stop" to Glover and he had something chrome in his pocket that day; that after the murder Bowen was acting real nervous and was asking friends to feel his heart because it was beating so fast; that, according to Cory McKay, on the day of the murder Bowen came by his house, he had someone in his car whom he said he was going to shoot, and he had a gun with him; that the chrome-and-brown-handled gun found at the crime scene fired the bullets that killed Glover; that an inmate in the county jail testified that Bowen had admitted to him that he killed Glover; and a letter by Bowen to his father suggesting he had committed the murder.

Bowen's defense was that Cory McKay had borrowed his car and perpetrated the murder. The jury found Bowen guilty of first-degree murder, and he was sentenced to life in prison.

## I. Sufficiency of the Evidence

We first consider whether the evidence was sufficient to support the judgment and sentence. If it was not, Bowen could not be retried due to his constitutional protection against double-jeopardy. *Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000); *Lee v. State*, 326 Ark. 229, 931 S.W.2d 433 (1996). Thus, we consider this issue before reviewing asserted trial error. *Burmingham v. State, supra; Lee v. State, supra.*

Bowen argues that there was no direct evidence that he was the person who murdered Glover. He adds that the State relied solely on the testimony of unreliable witnesses to establish that he was the last person to be seen with Glover and argues that this raises a reasonable doubt. He further contends that the evidence showing that Glover had been in his car on the day of the murder was consistent with his story that he loaned his car to Cory McKay and that it was McKay who drove Glover to the crime scene where he shot Glover. Further, Bowen claims that there were two witnesses who saw McKay in Bowen's car just prior to the murder and that there was another witness who saw McKay leave Bowen's apartment with Glover just before the murder. He asserts that the only State witness who testified that he was with Glover on the day of the murder was McKay himself and that McKay was obviously lying to protect himself.

■■ We do not reach the merits of this issue. When Bowen's counsel moved for a directed verdict at the conclusion of the State's case at trial, he stated only that his motion was based on a "lack of evidence." That was not enough. Arkansas Rules of Criminal Procedure 33.1(c) states:

> A motion for directed verdict or for dismissal based on insufficiency of the evidence must specify the respect in which the evidence is deficient. A motion merely stating that the evidence is insufficient does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense.

The court has repeatedly addressed this issue and held that a directed-verdict motion "requires movant to apprise the trial court of the specific basis on which the motion is made." *See, e.g., Davis v. State*, 330 Ark. 501, 506, 956 S.W.2d 163, 165 (1997) (court held that directed-verdict motion was not sufficiently specific to preserve

issue for review); *see also Jones v. State*, 318 Ark. 704, 889 S.W.2d 706 (1994) (court held that a "bright line" has been drawn and that directed-verdict motion must state specific grounds). Based on the above, it is clear that Bowen's claim of insufficient evidence is barred by his failure to state specific grounds in his directed-verdict motion.

## II. Suppression of Letters

Bowen's next point is that the trial court erred in failing to grant his motion to suppress two sealed letters to his father that he wrote while in the Lonoke County Detention Center awaiting trial.[1] In the more damaging letter dated March 31, 1998, Bowen wrote: "I want you to keep your head up to (*sic*), don't let this get to you ok, because I did it, and I'm going to have to pay for it but everyone knows I'm not a killer." The letters were opened by the jail administrator, Bob Holloman, and turned over to Lieutenant Sturdivant. The State then introduced the letters at trial. The issue is whether Holloman had the authority to confiscate Bowen's outgoing mail and read it.

Bowen initially maintains that he has a right to free speech and that his use of the mails is part of that right. The State correctly responds that Bowen did not raise this argument before the trial court. As a result, we will not address it for the first time on appeal. *Miner v. State*, 342 Ark. 283, 28 S.W.3d 280 (2000); *Windsor v. State*, 338 Ark. 649, 1 S.W.3d 20 (1999).

That leaves, however, Bowen's second argument that opening his mail violated his Fourth Amendment right to privacy. Bowen contends that the confiscation of his mail was preconviction and that the standards applied should be different from those applied to convicted felons who are in prison. He cites us to *Inmates of San Diego County Jail v. Duffy*, 528 F.2d 954 (9th Cir. 1975), in support of this proposition. Bowen further urges us to focus on the fact that the State produced no written policy or regulation adopted by the Lonoke County Sheriff's Department, which authorized the opening of mail. Moreover, he points out that he was placed in the

---

[1] Bowen's brief refers to letters to his father and brother, but the two letters introduced by the State are written to his father.

general jail population and not in isolation, which would be the case if he were on a suicide watch.

The State counters that the "general rule is that an inmate at a jail has no right to privacy." *Metcalf v. State*, 284 Ark. 223, 226, 681 S.W.2d 344, 346 (1984) (*citing People v. Hunt*, 133 Cal. App.3d 543, 184 Cal. Rptr. 197 (1982)). As such, where there is no reasonable expectation of privacy, the protections of the Fourth Amendment are not available. *Katz v. United States*, 389 U.S. 347, 351 (1967). Based on the above, the State argues that the Fourth Amendment is not violated when prison officials monitor outgoing mail to promote jail security. *See United States v. Kelton*, 791 F.2d 101 (8th Cir. 1986), *cert. denied*, 479 U.S. 989 (1986). That is what the State contends occurred with regard to Bowen.

More specifically, the State points to the fact that Holloman, as jail administrator, testified that Bowen was on suicide watch and, thus, it was necessary and permissible under the jail's unwritten practice and policy to inspect his outgoing mail. According to Holloman, Bowen's youth and his charge for committing a violent crime led to the watch. In addition, the State emphasizes that Bowen did in fact attempt to hang himself in the detention center three or four months after his mail was opened, which confirmed the potential for suicide.

■■■ We agree with the State's position on this matter. There was the testimony from Bob Holloman that Bowen was on a suicide watch and that it was the policy of the Lonoke County Detention Center, under such circumstances, to monitor outgoing mail. The trial court believed the testimony of the jail administrator. Surely prevention of suicide by young alleged offenders awaiting trial provides ample justification for opening their mail. In addition, this court has held that a letter written by an accused from jail to his wife prior to trial, which was turned over to the sheriff by a fellow inmate, was admissible into evidence. *See Metcalf v. State, supra.* The *Metcalf* facts bear some similarities to the case at hand, though the letter at issue in *Metcalf* was unsealed. And the State is correct that in that case we cited favorably to authority that an inmate in jail has no right to privacy. Bowen asks that we overrule our decision in *Metcalf*, but we decline to do so. There was no error in the trial court's ruling.

### III. Solicited Testimony

Bowen next contends that the trial court erred in not granting a mistrial when the prosecutor solicited testimony from Rachel Bennett in direct examination that Bowen sold her drugs. The specific colloquy was this:

> PROSECUTOR: And did you consider Jamie Bowen your friend, also?
>
> BENNETT: Not really. He was just an acquaintance.
>
> PROSECUTOR: Okay. That you bought drugs from?
>
> BENNETT: Yeah.

Bowen's counsel immediately objected and moved for a mistrial. The trial court denied the motion but gave a cautionary instruction to the jury that it should not consider Bowen's sale of marijuana in its deliberation on the murder charge but could consider it in connection with whether it provided the motive for Glover's death.

Bowen complains that this testimony is inadmissible under Rule 404(b) of the Arkansas Rules of Evidence because the sale of marijuana is uncharged misconduct that was introduced only to prove Bowen's propensity to commit a crime. Moreover, he contends that this evidence is highly prejudicial. He states that where the trial court allows testimony that is prejudicial and of little or no probative value in determining a defendant's guilt, the trial court commits reversible error. See McCoy v. State, 270 Ark. 145, 603 S.W.2d 418 (1980). See also Ark. R. Evid. 403.

The State's response is that Bowen's counsel did not object at the time of Bennett's testimony or set forth his grounds for the requested mistrial. We disagree with the State on this point. During the prosecutor's question that immediately followed the colloquy quoted above, Bowen's counsel asked for a sidebar conference, at which time he said: "I move for a mistrial again. The prosecutor has no business stating that." He then elaborated that what he objected to was the prosecutor's allusion to purchasing drugs from Bowen. The trial court said it would give a cautionary instruction. The prosecutor then argued that the drug testimony was necessary to establish the motive for the murder. The trial court concluded that

it would allow the jury to consider the testimony for purposes of motivation only.

 While we disagree that Bowen is procedurally barred from raising this point, the State is correct that a mistrial was not warranted. This court stated in *Davis v. State*, 330 Ark. 501, 956 S.W.2d 163 (1997), that a mistrial is a drastic remedy that is granted only when error is so prejudicial that justice cannot be served by continuing the trial or where fundamental fairness of the trial itself has been manifestly affected. That is not the situation here. For one thing, "motive" is a Rule 404(b) exception to the prohibition against proving other crimes in order to establish bad character. *See also Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), *cert. denied*, 520 U.S. 1244 (1997). The prosecutor's theory of the case was that Bowen sold drugs and that Glover's alleged theft of Bowen's drug money was the motive for his murder. Hence, Bowen's dealing drugs was a vital cog in the prosecutor's proof of motive.

██ Furthermore, the trial court gave a cautionary instruction to the jury that we believe adequately sets forth what could and could not be considered by the jury. An admonition to the jury is exactly what transpired in *Davis v. State, supra*. There was no abuse of discretion by the trial court in this regard.

## IV. Discovery Violation

For his final point, Bowen claims that the trial court erred in refusing to grant a mistrial or, alternatively, a continuance, when the State failed to comply with discovery requests. At issue was law enforcement's use of "309 prisoners" to search the crime scene following Glover's murder.[2] The prisoners found the chrome-and-brown-handled murder weapon. The names of the "309 prisoners" were not furnished to the defense before trial, even though in the motion for discovery, Bowen requested under Ark. R. Crim. P. 17.1(d) "any material or information within his knowledge, possession or control, or in the hands of any law enforcement agency, that

---

[2] A 309 prisoner is a prisoner in the custody of the Department of Correction who is on a work-release program with a local law enforcement agency to perform certain chores under the authority of Act 309 of 1983, now codified as part of Ark. Code Ann. §§ 12-30-401 through 407 (Repl. 1999).

could negate the guilt of the defendant of the offenses charged or should reduce the punishment therefor." After Bowen's mistrial motion, the trial court ordered that the names be provided to Bowen, but only a partial list of names was furnished. As a result, Bowen claims he was prejudiced in his defense.

■ ■ This point is barred for purposes of our review due to defense counsel's failure to raise his discovery objection to the trial court in timely fashion. The State points out that Lieutenant Sturdivant testified about the use of "309 prisoners" on the first day of the trial, and that Bowen's counsel did not mount his mistrial motion based on a discovery violation until the next day after eight additional witnesses had testified. This court has said: "[O]bjections to discovery violations must be made at first opportunity in order to preserve them for appeal." *Hinkston v. State*, 340 Ark. 530, 538, 10 S.W.3d 906, 911 (2000). Furthermore, it is unclear to us how disclosing the names of "309 prisoners" could negate the guilt of the defendant under Ark. R. Crim. P. 17.1(d). Certainly, Bowen did not make a case before the trial court or on appeal as to how he was thwarted, damaged, or prejudiced by the absence of this information.

We affirm the trial court's ruling on this point.

The record in this matter has been reviewed for other reversible error pursuant to Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.